**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

TIMOTHY CLAIR SHANNON,

        Plaintiff,

vs.

OFFICER MICHAEL KOEHLER, in his
individual and official capacities, CITY
OF SIOUX CITY, and JOSEPH C.
FRISBIE, in his individual and official
capacities,

        Defendants.

No. C08-4059-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

————————————

**TABLE OF CONTENTS**

*I.* **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    *A. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        *1. The events giving rise to this lawsuit* . . . . . . . . . . . . . . . . . 4
        *2. Koehler's training* . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        *3. The City and Chief Frisbie's involvement* . . . . . . . . . . . . . . 9
    *B. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*II.* **LEGAL ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    *A. Standards for Summary Judgment* . . . . . . . . . . . . . . . . . . . . . . . 13
    *B. Preliminary Matters* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
        *1. Bifurcation of claims* . . . . . . . . . . . . . . . . . . . . . . . . . . 17
        *2. Navrkal's statements in the record* . . . . . . . . . . . . . . . . . . 19
            *a. Arguments of the parties* . . . . . . . . . . . . . . . . . . . . 19
                *i. The defendants' initial arguments* . . . . . . . . . 19
                *ii. Shannon's arguments in response* . . . . . . . . 20
                *iii. The defendants' reply* . . . . . . . . . . . . . . . . . 21
                *iv. Oral arguments* . . . . . . . . . . . . . . . . . . . . . 22
        *3. Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      *C. Qualified Immunity for Alleged use of Excessive Force* . . . . . . . . . . . 23
        *1. A violation of a constitutional right* . . . . . . . . . . . . . . . 24
          *a. Arguments of the parties* . . . . . . . . . . . . . . . . . . . 24
            *i. The defendants' initial arguments* . . . . . . . . . 24
            *ii. Shannon's arguments in response* . . . . . . . . 26
            *iii. The defendants' reply* . . . . . . . . . . . . . . . 29
            *iv. Oral arguments* . . . . . . . . . . . . . . . . . . 30
          *b. Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
            *i. Severity of the crime* . . . . . . . . . . . . . . . 34
            *ii. Threat to Koehler or others* . . . . . . . . . . . 36
            *iii. Resisting arrest* . . . . . . . . . . . . . . . . . 41
            *iv. Other factors* . . . . . . . . . . . . . . . . . . . 42
            *v. Reasonableness of the force used* . . . . . . . . . 43
        *2. Reasonable official standard* . . . . . . . . . . . . . . . . . 44
          *a. Arguments of the parties* . . . . . . . . . . . . . . . . . . . 44
          *b. Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
    *D. Monell Liability* . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
        *1. Arguments of the parties* . . . . . . . . . . . . . . . . . . . 48
          *a. The defendants' initial arguments* . . . . . . . . . . . . . 48
          *b. Shannon's arguments in response* . . . . . . . . . . . . . 50
          *c. The defendants' reply* . . . . . . . . . . . . . . . . . . . 53
          *d. Oral arguments* . . . . . . . . . . . . . . . . . . . . . . . 54
        *2. Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
          *a. Pattern of unconstitutional misconduct* . . . . . . . . . . 56
          *b. Deliberate indifference or tacit authorization* . . . . . . 77
          *c. Causation* . . . . . . . . . . . . . . . . . . . . . . . . . 77
    *E. Assault and Battery* . . . . . . . . . . . . . . . . . . . . . . . . 79
        *1. Arguments of the parties* . . . . . . . . . . . . . . . . . . . 79
          *a. The defendants' initial arguments* . . . . . . . . . . . . . 79
          *b. Shannon's arguments in response* . . . . . . . . . . . . . 80
          *c. The defendants' reply* . . . . . . . . . . . . . . . . . . . 80
          *d. Oral arguments* . . . . . . . . . . . . . . . . . . . . . . . 80
        *2. Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

**III. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

The following is a brief description of the events involved in this controversy, which includes facts that are both undisputed and disputed: Police officer Michael Koehler, a defendant in this case, responds to a call for a disturbance between two females, at a bar, involving an injured person. Once Koehler arrives on the scene, he is greeted at the front door by a woman, Jill Murad, who allegedly states that one of the females inside had been "touched or grabbed by the male who was in the bar." Koehler and Murad walk to the middle of the establishment. The plaintiff, Timothy Shannon, is behind the bar. Shannon walks out from behind the bar, toward Koehler, and strongly states to Koehler, using profanity, that he owns the bar, does not need Koehler, and orders him to get out of the bar. Shannon eventually comes within arms length of Koehler. Koehler alleges that Shannon pokes him, once, in the chest. Shannon denies this. Koehler uses both his hands to holster his flashlight on a ring in the back of his belt. As he is doing this, Shannon allegedly pokes Koehler a second time, which Shannon denies, and Koehler performs a takedown, which causes Shannon to hit a bar stool and land on the hardwood floor. Once Shannon is on the ground, Koehler places a handcuff on one of Shannon's arms and, after using additional force, secures a second arm in the other handcuff. Koehler claims that the additional force was necessary because Shannon had tucked his arm under his body. Shannon denies being uncooperative and alleges that he was injured during his arrest.

Shannon has filed a lawsuit with this court, as a result of these events. In Count 1 of Shannon's lawsuit, he alleges that Koehler used excessive force in arresting him, in violation of the Fourth Amendment of the United States Constitution—Shannon brings a cause of action for this alleged violation under 42 U.S.C. § 1983. Shannon claims that Defendants City of Sioux City ("City") and Sioux City's Chief of Police at the time, Joseph Frisbie, are liable under § 1983 because they allegedly established, authorized, or

tolerated policies and practices that were intended to and did encourage, endorse, and permit their agents and employees to violate Shannon's, and other similarly situated individuals', constitutional rights. In Count 2, Shannon alleges that all defendants, directly or through *respondeat superior* liability, committed assault and battery. This case is now before the court on the defendants' motion for summary judgment.

## I. INTRODUCTION

### A. Factual Background

The court will not attempt, here, an exhaustive dissertation on the undisputed and disputed facts in this case. Rather, the court will set forth sufficient facts, both undisputed and disputed, to put the parties' arguments in context concerning the defendants' motion for summary judgment. Unless otherwise indicated, the facts recited here are undisputed, at least for purposes of summary judgment. Additional factual allegations and the extent to which they are or are not disputed or material will be discussed, if necessary, in the court's legal analysis.

#### 1. The events giving rise to this lawsuit

This case arises from an incident that occurred on September 13, 2006, at Tom Foolery's Pub and Grill ("Tom Foolery's") in Sioux City, Iowa. On September 12th, and the early morning of September 13th, Plaintiff Timothy Shannon had had several alcoholic drinks and believed himself to be intoxicated to the point where he could and should not drive a vehicle. At approximately 1:16 a.m., on the morning of September 13th, Christina Navrkal and Jill Murad visited Shannon at Tom Foolery's. Murad had called Navrkal to transport her to Tom Foolery's because Stacy, Murad's sister, had informed Murad that Shannon had had too much to drink and needed help getting home—Murad needed Navrkal to drive her because Murad did not have a license. Navrkal, however, also knew Shannon

because she had worked with him at the now defunct Steak Block restaurant in Sergeant Bluff, Iowa. When Murad and Navrkal arrived at Tom Foolery's, they were intoxicated.

The defendants claim that, once Navrkal and Murad arrived at Tom Foolery's, the two women entered into an altercation with Shannon. In fact, the defendants claim that Shannon punched the left side of Navrkal's face with a close fisted right punch. Navrkal grabbed the side of her face with her hand. Murad then shoved Shannon with both hands causing him to fall backward and onto the floor. After Murad shoved Shannon, she turned around, grabbed her beer, and walked to the front of the bar, near the door, with Navrkal. Navrkal continued to hold her face. Shannon remained on the floor, behind the bar, until a male bartender picked up the liquor bottles that Shannon knocked over in his fall and assisted Shannon to his feet. Murad continued yelling at both the male bartender and Shannon while Navrkal continued to walk around with her hand to her face. The male bartender left the bar at approximately 1:30 a.m.

At approximately 1:40 a.m., Murad called 911 because she became concerned for Shannon's well-being based on the head injury he received from the fall. Murad advised the dispatcher that Shannon's head was bleeding. This first 911 call ended, and Murad called 911 a second time and stated there had been an argument and to please send an ambulance.

At approximately 1:46 a.m., Sioux City Police officers were dispatched to Tom Foolery's. Two dispatches went out. The first was for a medical call requesting an ambulance. The second advised officers of a disturbance at the bar between two females and that there was an injured person there. Koehler volunteered to respond to the scene because he was only about a block away. Koehler was the first officer to arrive at Tom Foolery's. Koehler was met at the door by Murad, who let him into the bar.

According to the defendants, as Koehler was entering the bar, Murad stated that one of the females in the bar had been "touched or grabbed by the male who was in the bar." However, Shannon alleges that he did not hear anyone make such a statement and claims that Murad has testified in her deposition that she does not know if she made such a statement to Koehler. Koehler walked to the middle of the bar with Murad and stopped. Murad pointed at Shannon.

It is undisputed that Shannon walked out from behind the bar and toward Koehler. However, the defendants claim that, as Shannon approached Koehler, Shannon swore at him, kicked an overturned bar stool, demanded that Koehler leave the premises, and then aggressively approached Koehler with his right arm extended and with two fingers pointed at Koehler. The parties agree that, while approaching Koehler, Shannon stated something like, "I'm Tim Shannon, I own this bar, get out;" asked Koehler for a warrant; "strongly" told Koehler to leave; and probably used profanity. Shannon further admits that he probably came up to Koehler and told him to "get out . . . I don't need you . . . I don't want you in here . . . I don't need you, get out." The parties agree that Shannon stopped his approach toward Koehler when he was approximately an arm's length away. Although Shannon admits that he approached Koehler, Shannon claims that Koehler had asked him to approach. Shannon also claims that his approach toward Koehler was not aggressive and did not involve him kicking a bar stool. Instead, Shannon claims that he walked toward Koehler with his hands out so that Koehler could see them and that he had a finger pointed at Koehler. While Shannon and Koehler were at arm's length, Murad and Navrkal were to Koehler's right and Shannon's left.

The defendants claim that Shannon then poked Koehler in the chest with his two fingers, while Shannon denies that he touched Koehler. It is undisputed that shortly after Shannon neared Koehler, Koehler turned off his flashlight and placed both hands behind

6

his back in order to holster his flashlight in the ring holder located in the middle of the backside of his belt. The defendants allege that Shannon then poked Koehler in the chest a second time, and it is undisputed that Koehler took Shannon down by pushing his upper body and sweeping his legs—the parties dispute whether Koehler performed a proper leg sweep.[1] The defendants claim that Koehler learned the leg sweep technique at the police academy. However, Shannon claims that the leg sweep technique actually used by Koehler was not included in the Defensive Tactics Instructor School description (Defendants' App. 118) and is not taught in police academies as an effective control and compliance measure. Because of Koehler's actions in taking down Shannon, he fell backward onto a bar stool. Shannon claims that Koehler was aware that the bar stool was there. The defendants claim that Shannon had knocked over the stool and that Koehler did not know that it was there.

After Shannon was on the ground, Koehler attempted to handcuff him. Koehler told Shannon to put his arms behind his back. Koehler grabbed Shannon by the arm, rolled him and was able to get his left arm behind his back. Koehler was able to get one handcuff on Shannon's left arm. The defendants claim that Shannon tucked his right arm underneath his body and would not put it behind his back despite being ordered by Koehler to do so. The defendants also claim that, while Shannon was being handcuffed, he was belligerent. However, Shannon denies that he tucked his right arm underneath his body, denies not putting it behind his back, and denies that he was belligerent.

Shannon claims that he received the following injuries on September 13, 2006: atelectasis in the base of the left lung (collapsed lung), multiple fractured ribs, a contusion to the head, a five centimeter laceration to the head, bruising on the left leg, left shoulder,

---

[1] The "leg sweep" technique is a use of force procedure taught in police academies as an effective control and compliance measure.

left arm, and pelvis/hip, and a laceration to the right shoulder. The defendants claim, however, that the medical records from that night show that Shannon was only treated for a head laceration, which required stitches.

Murad was interviewed by an officer at the scene—this interview was audio taped. However, Murad refused to complete a voluntary written statement at Tom Foolery's. She subsequently completed a written statement and was deposed, despite complications in serving her with a subpoena. Murad claimed that her memory of September 13, 2006, at the time of her deposition on May 18, 2009, was foggy.

Navrkal was interviewed by a Sioux City Police Officer on an audio device and completed a written voluntary witness statement at the scene. Navrkal's deposition has been scheduled four different times, and despite the defendants' alleged best efforts, they have been unable to serve Navrkal with a notice of subpoena and ask the court to consider her an unavailable witness under the federal rules of evidence.

### 2. *Koehler's training*

Koehler was trained to use no more force than is reasonable and necessary under the circumstances. One of the techniques Koehler was taught to employ to that end, was a wrist flex, when finger-jabbed by a suspect. Shannon claims that Koehler disregarded his training by failing to perform a wrist flex procedure. In addition, Shannon alleges that Koehler violated his training by using both hands to put his flashlight away behind his back—if he was reacting to what he believed to be an imminent threat of physical assault. Shannon also argues that using the leg sweep coupled with a push to the throat area was highly dangerous and excessive, even if Shannon had poked Koehler. The defendants claim that Koehler properly put his flashlight away, as officers are discouraged from using their flashlights as weapons, and that Koehler did not push Shannon's throat. Shannon has

an alleged expert, Joseph Stine, who opines that Koehler's use of force was unreasonable, excessive, dangerous, and reckless.

### 3. The City and Chief Frisbie's involvement

From 2001 to 2008 there have been 42 complaints about the amount of force used by members of the Sioux City Police Department ("SCPD"). According to Shannon, the City and Chief Frisbie[2], by failing to properly investigate excessive force complaints, discourage the community from filing complaints. In addition, Shannon argues that the investigations are designed and intended to cover up and justify abuses of police authority and excessive/unreasonable force. Shannon also claims that Koehler was emboldened to use excessive force on Shannon because of the lack of fair and thorough investigations into excessive force complaints—Koehler knew that the City and Chief Frisbie would support him in his use of excessive force on Shannon. The defendants claim that there is no evidence that wrongdoing was covered up and that the investigations do meet numerous Commissions on the Accreditation for Law Enforcement Agencies ("CALEA") standards. The defendants deny that Koehler used excessive force and deny that inadequate investigations into excessive force complaints caused Koehler to use excessive force. Koehler has been investigated six times for alleged code of conduct violations, and Shannon claims that two of the investigations were for excessive force complaints.

---

[2]   Joseph Frisbie was the Chief of Police for the City on September 13, 2006. Chief Frisbie is under the general direction of the City Manager and—with the City Manager—formulates polices and regulations governing the Police Department. Chief Frisbie was also ultimately responsible for disciplining police personnel. Chief Frisbie retired on March 31, 2009. *See Police Chief Celebrates Retirement*, KCAU-TV News, March 31, 2009, available at http://www.kcautv.com/global/story.asp?s= 10106189&ClientType=Printable.

It is undisputed that, from 2001 to 2008, the SCPD averaged 4.17 excessive force complaints per year per 100 full time officers. Shannon claims that this figure is consistent with the national average and indicates that the complaint process, at the intake point, is adequate. However, Shannon claims that the 2006 Department of Justice Report lists a probability that a complaint will be sustained at nine percent and that the zero percent of sustained[3] complaints with the SCPD is statistically unlikely. Shannon relies on a second alleged expert, Dr. Zhongming Huang, for these opinions.

It is undisputed that no professional standards division investigation occurred for Shannon's complaint of excessive force—on October 31, 2006, Shannon, through counsel, sent a letter to the City, City Attorney Jim Abshier, and Chief Frisbie indicating that he believed Koehler used excessive force and that he intended to file suit against Koehler and the City[4]. It is undisputed that Shannon did not receive a response to his letter. However, the defendants claim that the lack of a response and the lack of an investigation into Shannon's claim was due to his assertion that he was going to sue Koehler and the City—when the department receives an intent to sue letter, the correspondence is forwarded to the City Legal Department for further handling because it indicates that an

---

[3] The disposition of complaints will be one of the following under the SCPD's Citizen Complaint Procedure: (1) Unfounded, (2) Exonerated, (3) Not Sustained, or (4) Sustained. *See* Plaintiff's App. at 187. Unfounded means the "incident did not occur or officers [were] not involved." *Id.* Exonerated means the "incident occurred but [the] officer acted lawfully and properly. *Id.* Not Sustained means there was "[i]nsufficient evidence to prove or disprove the allegation. *Id.* Sustained means that the "allegation is supported by sufficient evidence." *Id.*

[4] The defendants qualify this claim by stating the letter was sent certified mail to Paul Eckert, City Manager, and allegedly copied to "council, Jim Abshier, and police chief." Docket no. 47.

administrative investigation is no longer warranted and the matter has proceeded to litigation.

## B. *Procedural Background*

On August 1, 2008, plaintiff Timothy Shannon filed a complaint with this court concerning the incident that took place on September 13, 2006, naming Officer Michael Koehler, the City of Sioux City, the Sioux City Police Department, and Police Chief Joseph Frisbie as defendants. Docket no. 2. In Count 1, Shannon alleges that Koehler used excessive force in arresting him, in violation of the Fourth Amendment of the United States Constitution—Shannon brings a cause of action for this violation under 42 U.S.C. § 1983. Shannon claims that Defendants City, SCPD, and Chief Frisbie, are liable under § 1983 because they allegedly established, authorized, or tolerated policies and practices that were intended to and did encourage, endorse, and permit their agents and employees to violate Shannon's, and other similarly situated individuals', constitutional rights. In Count 2, Shannon alleges that all defendants, directly or through *respondeat superior* liability, committed assault and battery. *Id.* On September 10, 2008, defendant SCPD filed its Rule 12(b)(6) Motion to Dismiss SCPD (docket no. 5), which this court granted on October 14, 2008[5]. *See* docket no. 9.

On March 30, 2009, Chief United States Magistrate Judge Paul A. Zoss granted the defendants' motion to bifurcate the claims against the City and Chief Frisbie from the constitutional and state tort claims against Koehler. *See* docket no. 23. The court ordered that a separate trial would be held as to the claims against the City and Chief Frisbie after

---

[5] This court dismissed the SCPD because it was not a suable entity but simply a subdivision of a municipality. *See Shannon v. Koehler*, 2008 WL 4735265 (N.D.Iowa October 13, 2008).

trial of the individual claims against Koehler.  According to Judge Zoss, bifurcation would avoid any prejudice to the City and Chief Frisbie that might result from trying all of the claims together.  *Id.* (citing Fed. R. Civ. P. 42(b) ("For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims.  When ordering a separate trial, the court must preserve any federal right to a jury trial.")).  This court finds this ruling clearly erroneous, as is discussed below.

On August 25, 2009, Shannon filed his First Motion in Limine to Bar Reference to Certain Facts not Known at the Time of Plaintiff's Arrest (docket no. 30), which is now fully briefed.  The court has not yet ruled on this motion.

On August 31, 2009, the defendants filed their Motion for Summary Judgment and Request for Oral Argument and accompanying filings (docket no. 31).  The defendants allege that Koehler is entitled to qualified immunity on all counts, including the state assault and battery charges.  In addition, the defendants claim that, even if Koehler's actions were unconstitutional, Shannon cannot meet his burden to demonstrate that the City or Chief Frisbie tolerated an unconstitutional policy, practice, or custom of failing to train and supervise officers.  On October 8, 2009, Shannon filed his timely Resistance to Defendants' Motion for Summary Judgment and filings in support (docket no. 40), resisting the defendants' motion on all alleged grounds.  On October 19, 2009, the defendants filed their timely Reply Brief in Support of Defendants' Motion for Summary Judgment (docket no. 46-2) and associated filings (*see* docket nos. 47 and 49[6]).

On November 19, 2009, this court heard oral arguments on the defendants' motion. Jason Gann of Berenstein, Moore, Berenstein, Heffernan & Moeller, L.L.P., argued on

---

[6]  Docket no. 49 was filed on October 20, 2009.

Shannon's behalf. Jeff Wright of Heidman, Redmond, Fredregill, Patterson, Plaza, Dykstra & Prahl argued on behalf of the defendants. The arguments were spirited and both counsel were exceptionally well prepared and responsive to the court's numerous questions.

## II. LEGAL ANALYSIS

### A. Standards for Summary Judgment

Motions for summary judgment essentially "define disputed facts and issues and . . . dispose of unmeritorious claims [or defenses]." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1982 (2007); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . . ."). Any party may move for summary judgment regarding "all or any part" of the claims asserted in a case. FED R. CIV. P. 56(a), (b) (allowing a claimant to move for summary judgment "at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party," and allowing a defending party to move for summary judgment "at any time"). Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no *genuine* issue of *material* fact and that the moving party is entitled to a judgment as a matter of law." *Id.* 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

A fact is *material* when it "'might affect the outcome of the suit under the governing law.'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, "the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248. Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.* An issue of material fact is *genuine* if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods*, 409 F.3d at 990 (quoting *Anderson*, 477 U.S. at 248); *see Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (stating genuineness depends on "whether a reasonable jury could return a verdict for the non-moving party based on the evidence"). Evidence presented by the nonmoving party that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, such as a "scintilla of evidence," *Anderson*, 477 U.S. at 252; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997), or evidence that is "merely colorable" or "not significantly probative," *Anderson* at 249-50, does not make an issue of material fact genuine.

Thus, a *genuine issue of material fact* is not the "mere existence of some alleged factual dispute between the parties." *State Auto. Ins. Co. v. Lawrence*, 358 F.3d 982, 985 (8th Cir. 2004). "'Instead, "the dispute must be outcome determinative under prevailing law."'" *Mosley v. City of Northwoods*, 415 F.3d 908, 910-11 (8th Cir. 2005) (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992), in turn quoting *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989)). In other words, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial."

*Anderson*, 477 U.S. at 248-49.  Essentially, a genuine issue of material fact determination, and thus the availability of summary judgment, is a determination of "whether a proper jury question [is] presented." *Id.* at 249.  A proper jury question is present if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

Procedurally, the moving party does not have to "support its motion with affidavits or other similar materials *negating* the opponent's claim," *Celotex*, 477 U.S. at 323, but the moving party does bear "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323).  Thus, a movant need only demonstrate the absence of a genuine issue of material fact and that it is entitled to judgment according to law.  *See Celotex*, 477 U.S. at 323 ("[T]he motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied.").  Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Mosley*, 415 F.3d at 910 ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995))).  Thus, the movant must show the absence of a genuine issue of material fact as it relates to the substantive law, and the nonmovant must show the alleged issue of fact is genuine and material as it relates to the substantive law.  If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the

opposing party is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 322; *In re Temporomandibular Joint*, 113 F.3d at 1492.

In considering whether a genuine issue of material fact is present the court must view all the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88; *Mosley*, 415 F.3d at 910. Further, the court must give such party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita*, 475 U.S. at 587-88. However, "because we view the facts in the light most favorable to the non-moving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Rather than "attempt[ing] to determine the truth of the matter . . . the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

Of course, the facts are not the sole concern of the court; after all, a genuine issue of material fact necessarily depends on the substantive law. *See Holloway*, 884 F.2d at 366 ("The presence of a genuine issue of fact is predicated on the existence of a legal theory which can be considered viable under the nonmoving party's version of the facts. The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law."). Thus, the relevant law concerning plaintiff's claims is pivotal. *Anderson*, 477 U.S. at 252 ("[T]he inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."); *see Brandon v. Lotter*, 157 F.3d 537, 539 (8th Cir. 1998) ("'In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law.'" (quoting *Hartnagel*, 953 F.2d at 396)). Even if no genuine issue of material fact is present, summary judgment is not

appropriate unless the governing law supports the moving party's position. FED. R. CIV. P. 56(c) (requiring the moving party to show that it "is entitled to judgment as a matter of law"). Moreover, summary judgment is particularly appropriate "where the unresolved issues are primarily legal rather than factual." *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996).

## B. Preliminary Matters

### 1. Bifurcation of claims

On March 30, 2009, Chief United States Magistrate Judge Paul A. Zoss granted the defendants' motion to bifurcate the claims against the City and Chief Frisbie from the constitutional and state tort claims against Koehler. *See* docket no. 23. The defendants had moved to bifurcate the claims, and Shannon did not resist bifurcation. According to Judge Zoss, bifurcation would avoid any prejudice to the City and Chief Frisbie that might result from trying all of the claims together. *Id.* (citing FED. R. CIV. P. 42(b) ("For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims. When ordering a separate trial, the court must preserve any federal right to a jury trial.")).

At the beginning of this court's November 19, 2009, hearing, the court reconsidered—*sua sponte*—Judge Zoss's order bifurcating the claims in this case. The defendants' counsel claimed that he requested bifurcation because he thought it was in the best interest of his multiple clients to have the cases heard separately so that evidence regarding one claim did not influence the outcome of the other claim. Shannon's counsel did not present any arguments concerning whether the claims should be bifurcated.

As Judge Zoss explained, "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." FED. R. CIV. P. 42(b). Courts have recognized that many factors may be relevant to the determination of whether or not to bifurcate proceedings pursuant to Rule 42(b). *See O'Dell v. Hercules, Inc.*, 904 F.2d 1194, 1201-02 (8th Cir. 1990) ("In exercising discretion, district courts should consider the preservation of constitutional rights, clarity, judicial economy, the likelihood of inconsistent results and possibilities for confusion."); *accord Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada*, No. 4:00-CV-1073, 2006 WL 1026992, *2 (E.D. Mo. 2006) ("Multiple factors govern whether bifurcation is appropriate in any given case, including the separability of the issues; simplification of discovery and conservation of resources; prejudice to the parties; and the effect of bifurcation on the potential for settlement.") (citing *F & G Scrolling Mouse, L.L.C. v. IBM Corp.*, 190 F.R.D. 385, 387 (M.D.N.C. 1999)); *Eischeid v. Dover Constr., Inc.*, 217 F.R.D. 448, 466 (N.D. Iowa 2003) (citing *O'Dell*, 904 F.2d at 1201-02, as identifying pertinent factors, and noting, further, that Rule 42(b) expressly identifies "expedition" and "economy" as pertinent factors). However, the key issue is whether bifurcation is necessary to avoid prejudice. *Athey v. Farmers Ins. Exchange*, 234 F.3d 357, 362 (8th Cir. 2000) (because the movant could not show prejudice, the district court did not abuse its discretion by refusing to bifurcate claims); *see also Kuiper v. Givaudan, Inc.*, 602 F.Supp.2d 1036, 1055 (N.D.Iowa 2009) (reciting the above standards).

In this case, the defendants claim that their multiple clients may be prejudiced if the court does not hold separate trials. Although this possibility is often present when this court presides over cases with multiple defendants, especially where there are multiple criminal defendants, the defendants in this case have failed to sufficiently show how they

would be prejudiced in this case if the claims were not bifurcated. In addition, the court does not find that separate trials would increase efficiency for either party. Rather, separate trials would be a waste of, at the least, judicial resources. As a result, this court finds that Judge Zoss's finding that the claims should be bifurcated was clearly erroneous and the court **reverses** Judge Zoss's Order (docket no. 23) to the extent it bifurcated claims in this lawsuit. *See* 28 U.S.C. § 636 (b)(1)(A) ("[A] judge may designate a magistrate judge to hear and determine any pretrial matter pending before the court. . . . A judge of the court may reconsider any pretrial matter under this subparagraph . . . where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law.") The jury trial for all claims in this case is set for January 11, 2010.

## 2. *Navrkal's statements in the record*

### a. *Arguments of the parties*

*i.* ***The defendants' initial arguments***. The defendants claim that Navrkal is an unavailable witness under Federal Rule of Evidence 804[7] and ask the court to consider her

---

[7] Rule 804(a) provides:

> Definition of unavailability. "Unavailability as a witness" includes situations in which the declarant--(1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement; or (2) persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so; or (3) testifies to a lack of memory of the subject matter of the declarant's statement; or (4) is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or (5) is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance (or in the case of a hearsay exception under subdivision (b)(2), (3), or (4), the declarant's

(continued...)

statements, that might otherwise be hearsay, as part of the factual record for their motion for summary judgment. The defendants claim that they have scheduled Navrkal's deposition four times: April 13, 2009, May 18, 2009, May 28, 2009; and August 24, 2009. Deena Townley, counsel for the defendants, claims to have contacted Navrkal by phone, on May 19, 2009, but alleges that Navrkal immediately hung up once Townley informed her of the reason for the call.

The defendants' attorneys also claim to have contacted Navrkal's former attorney, who may or may not currently represent her, to assist with scheduling the deposition, to no avail. The defendants' attorneys allege that they have further employed several methods of attempting service of the subpoena on Navrkal, but none have been successful. The defendants claim that they have made a good faith and reasonable effort to locate Navrkal and that she is unavailable pursuant to Rule 804. The defendants argue that, as a result, the statements Navrkal made minutes after the events at issue are admissible and should be considered by the court in evaluating the defendants' motion for summary judgment.

*ii.* ***Shannon's arguments in response***. Shannon opposes the defendants' request that the court consider Navrkal unavailable under Federal Rule of Evidence 804(a). In response to the defendants' claim that they have made a good faith and reasonable effort

---

[7](…continued)

> attendance or testimony) by process or other reasonable means. A declarant is not unavailable as a witness if exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of a statement for the purpose of preventing the witness from attending or testifying.

FED. R. EVID. 804(a).

to serve Navrkal with a deposition subpoena, Shannon claims that the effort did not amount to a good faith effort. Instead, Shannon alleges that the defendants only made two attempts to serve a deposition subpoena on Navrkal. The first attempt was on May 20, 2009, and the second was on July 31, 2009. In addition, Shannon claims that the July 31st attempt was not until the eve of their original summary judgment deadline, and even though the process server found out that Navrkal's address was incorrect, the timing of the second attempt left no room for an additional attempt. Even if the court finds Navrkal unavailable under Rule 804(a), Shannon claims that the defendants have failed to argue what exception to the hearsay rule is applicable, under Rule 804(b).

*iii.* ***The defendants' reply***. The defendants claim that the court need not declare Navrkal unavailable in order for her testimony to be admissible, as it would be admissible under the catch-all exception in Rule 807. The defendants argue that Navrkal's recorded and written statements have substantial indicia of trustworthiness: her statement that Shannon "slammed" the ambulance guy (Koehler) is corroborated by the surveillance video; she was positioned approximately three feet from the parties and looking directly between them; she "clearly was not out to get Shannon" when making these statements as she immediately told the officer she did not want Shannon charged with assault; and her efforts to avoid giving sworn testimony—while remaining friends with Shannon—evidences her desire to avoid contradicting Shannon's description of what occurred.

The defendants also argue that Navrkal's statements are admissible under Rule 803(2). The defendants claim that Navrkal's recorded statement was made within fifteen minutes of the events and that the tone of her voice evidences her highly emotional state at the time of the recording. Again, the defendants claim that these statements have indicia of trustworthiness and are admissible regardless of whether the court finds Navrkal unavailable.

*iv.*    ***Oral arguments***.  The defendants' counsel alleged, at oral arguments, that they had tried several times to take Navrkal's deposition.  However, counsel claims that the discovery deadline had passed, and counsel had given up his effort to obtain Navrkal's deposition, for that reason.

**3.**    ***Analysis***

Federal Rule of Civil Procedure 804 provides certain hearsay exceptions when a declarant is found to be "unavailable."  *See* FED. R. EVID. 804.  However, the defendants have failed to explain what exception under Rule 804(b) is potentially applicable to Navrkal's hearsay statements.  As a result, the court finds it unnecessary to consider, at this time, whether Navrkal is an unavailable witness pursuant to Rule 804.

In the defendants' reply, they argue that Navrkal's recorded and written statements are admissible under Federal Rules of Evidence 807 and 803(2).  Rule 807, the "Residual Exception" to the hearsay rule, states:

> A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

FED. R. EVID. 807. In the defendants' reply, they also ask the court to consider Navrkal's recorded and written statements under the "Excited Utterance" exception to the hearsay rule, which provides hearsay statements, "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition," are admissible even if the declarant is available as a witness. FED. R. EVID. 803(2).

The court declines to rule on the admissibility of Navrkal's statements at this time. First, the defendants did not raise these additional grounds for considering Navrkal's statements until their reply brief. Second, consideration of Navrkal's statements would not impact this court's ruling on the defendants' motion for summary judgment—the defendants are asking the court to believe Navrkal's statements that allegedly accuse Shannon of making physical contact with Koehler, when Shannon claims that he did not make physical contact with Koehler. This would be an impermissible credibility determination. *See Kammueller*, 383 F.3d at 784 ("because we view the facts in the light most favorable to the non-moving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses.") Lastly, as the court mentioned during oral arguments, it will extend the discovery deadline in order for the defendants to take Navrkal's deposition, if requested.

### C. Qualified Immunity for Alleged use of Excessive Force

The defendants claim that Koehler is entitled to qualified immunity for his alleged use of excessive force on September 13, 2006. The United States Supreme Court has explained the reasoning behind the concept of qualified immunity: "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* In fact, "[t]he protection of

qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson v. Callahan*, 129 S.Ct. 808, 815 (2009) (quoting *Groh v. Ramirez*, 540 U.S. 551, 567, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004) (KENNEDY, J., dissenting) in turn citing *Butz v. Economou*, 438 U.S. 478, 507, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)).

The Eighth Circuit Court of Appeals has recently repeated the two part test applicable to determining whether an official is entitled to qualified immunity: "To determine whether the defendants are entitled to qualified immunity, we ask (1) whether the facts alleged or shown, construed in the light most favorable to [the nonmoving party], establish a violation of a constitutional . . . right, and (2) whether that constitutional right was clearly established as of [the date of the alleged incident], such that a reasonable official would have known that his actions were unlawful." *Krout v. Goemmer*, 2009 WL 3172180, 4 (8th Cir. 2009) (citing *Pearson*, 129 S.Ct. at 815-16); *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), overruled in part on other grounds by *Pearson*, 129 S.Ct. at 818); *Pearson*, 129 S.Ct. at 815 ("The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'") (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The official is entitled to qualified immunity unless the court affirmatively answers both of these inquiries. *See id.*

## 1. *A violation of a constitutional right*

### a. *Arguments of the parties*

#### i. *The defendants' initial arguments*. The defendants claim that Koehler's actions in arresting Shannon were objectively reasonable under the circumstances. First, the defendants allege that Shannon's background provided a threat to Koehler. Shannon

is allegedly a highly trained, well respected, and decorated former police officer and soldier, who had attended no less than four police academies. The defendants cite Shannon's own statements concerning how he is "extremely well trained" and "extremely well educated," docket no. 31-2 (citing Defendants' App. at p. 59), and is "as trained and probably better trained" than Koehler, *id.* (citing Defendants' App. at 60), in support of their argument that Shannon was a threat to Koehler. The defendants allege that Koehler was aware of Shannon's prior service in law enforcement and his training in defensive tactics.

The defendants also argue that other circumstances that night posed a threat to Koehler and the two females present. The defendants claim that Shannon concedes that the police were dispatched to Tom Foolery's for a "disturbance." Docket no. 31-7 (citing Defendants' App. at 4, ¶ 13). In addition, the defendants claim that the fact that there were two 911 calls, the time of the calls, the location of the disturbance, and the dimly lit bar indicates that the police were walking into a potentially volatile situation. The situation also included two females, one of which had been assaulted by Shannon earlier in the night.

Once Koehler entered the bar, Shannon's behavior also showed that Koehler's and the two females' safety was threatened by Shannon, according to the defendants. Shannon was allegedly arguing with the two females, could have had concealed weapons, approached Koehler in an aggressive manner, and came close enough to Koehler to assault him twice. The defendants argue that Shannon had ignored Koehler's verbal control measures to attempt to diffuse the incredibly tense and uncertain situation. The defendants claim that these circumstances show that the situation was quickly evolving and had the potential to turn violent.

Although the defendants claim that Shannon assaulted Koehler, twice, the defendants argue that, even if the court finds that Shannon did not touch Koehler, Koehler acted objectively reasonable in his use of force to arrest Shannon. The defendants claim that, absent an assault, Koehler was still faced with an immediate threat based on Koehler's observations that: there was a disturbance in a bar near closing time; "a female in the bar had been touched or grabbed by Shannon;" docket no. 31-7 (citing Defendants' App. 90, ¶ 4; Defendants' App. 68, ¶ 3, Defendants' App. 299); Shannon was in an argument with the two women at the bar; Shannon was belligerent and uncooperative with Koehler's efforts to provide him with assistance; and Shannon opposed Koehler's lawful authority. In other words, the defendants claim that Koehler found himself confronted with a belligerent drunk who had potentially harmed another person and required forcible detention.

  ***ii.***   ***Shannon's arguments in response***. Shannon claims that the defendants' account of Koehler's arrest of Shannon fails to view the facts in the light most favorable to Shannon and fails to properly consider only the facts that Koehler knew at the time of the arrest. Shannon argues that Koehler had responded to assist paramedics who had been called to care for "an injured party" and that there had been "a disturbance between two females." Docket no. 40 (citing Defendants' App. at 68).

  Once Koehler entered the bar and approached Shannon, Murad, and Navrkal, Shannon claims that the surveillance tape and other evidence shows that Koehler did not believe Shannon posed a threat to anyone. Shannon alleges the following: After Koehler entered the bar, he walked to the middle of the room without assuming a defensive posture. There was no sign that Koehler believed Shannon had a weapon, and Koehler still does not allege that he ordered Shannon to place his hands where he could see them. Koehler does not ask Murad or Navrkal to move away from him, or from Shannon, at the bar. Instead,

Koehler asked Shannon to come out from behind the bar. While Shannon was approaching Koehler, Koehler did nothing to demonstrate that he believed Shannon was a threat—he maintained an upright position; did not move to a defensive posture; did not direct Shannon to back away; did not tell Shannon to put his hands in front of him or behind his head; did not direct Shannon to the ground; did not direct Shannon to submit to an arrest; and did not attempt to reposition Murad and Navrkal. Shannon told Koehler that his assistance was not needed, that he could leave, and asked for a warrant. At this point, Koehler did not use verbal judo or language to reassure Shannon that he was there to make sure that everyone was okay but instead contested the need for a warrant. As Shannon approached Koehler, Koehler continued to maintain his upright position, but he turned off his flashlight and, after allegedly being poked by Shannon, used both of his hands to place his flashlight in its holster, which Shannon claims is also inconsistent with Koehler's claim that he was under assault and vulnerable to being punched at this point. From this defenseless position, Koehler suddenly, swiftly, and aggressively brought his hands back in front of him and grabbed Shannon by the throat and slammed him to the ground—Shannon alleges that this move was not a leg sweep. This happened so quickly that there was no time for Shannon to have poked Koehler in the chest a second time, as Koehler alleges. Shannon claims that this account of what occurred should be considered by this court as these are the facts in the light most favorable to him. According to Shannon, a jury could conclude that these facts demonstrate that Koehler made the decision to throw Shannon to the floor the moment he came within reach of Koehler, without regard to the alleged pokes in the chest.

Shannon also alleges that excessive force was used in securing his arrest, once he had been taken to the ground. Shannon claims that Koehler justifies the force he used once Shannon was on the ground based on Shannon's refusal to comply with the handcuffing.

However, Shannon claims that any noncompliance resulted from being thrown onto a bar stool, which left him completely incapacitated and dazed. Once Shannon was on the floor, he claims that Koehler proceeded to violently twist, turn, drag, knee, and shove Shannon's limp body, including several head-bangs against the floor and one against the metal-covered edge of the step of a booth. In doing this, Shannon was allegedly turned 270 degrees from his original position and left with abrasions, cuts to his head, a broken rib, and a collapsed lung.

Shannon claims that Koehler's explanation of the arrest provided to another officer directly after the arrest shows that Koehler believed he had to exaggerate Shannon's alleged assault in order to justify his use of force. Shannon also claims that Koehler's statement that Shannon "lost" was equally telling[8]. Shannon claims that he did not poke Koehler and that his force was excessive considering the situation was not "tense, uncertain, and rapidly evolving," as Koehler claims, and that there was no need to make the alleged "split-second judgments." *Id*.

Shannon also claims that Koehler was not investigating a severe crime when he was called to Tom Foolery's. Instead, Koehler was responding to a call to provide medical assistance and to a disturbance. According to Shannon, Koehler was certainly not investigating the crime of assaulting a police officer. However, Shannon alleges that the force was excessive, even if he had poked Koehler—a poke did not warrant a chest thrust or leg sweep resulting in an uncontrolled fall onto a hardwood floor. Koehler performed a violent leg sweep and chest thrust, causing Shannon to land on an overturned bar stool. After Shannon was on the ground, Koehler smashed Shannon's head repeatedly onto a step

---

[8] It is undisputed that while Shannon was being treated at Mercy Medical Center, Koehler told Carissa Roach that Tim Shannon was being charged with "Assault on a Police officer" and "[Shannon] lost." *See* docket no. 47.

and the hardwood floor, and Koehler drove his knee into Shannon's back, while jostling Shannon and turning him almost 270 degrees. Shannon also alleges that he was not actively resisting arrest and did not pose a threat to Koehler or anyone else on the scene. Lastly, Shannon claims that Koehler's actions were contrary to the training he received, as Koehler was allegedly trained to grab the finger of the suspect's weak hand, bend the finger back in the opposite direction, and step back or to the side.

   *iii.*     ***The defendants' reply***. The defendants claim that, even though Shannon has stated that he has no memory of the events of the night in question—other than from watching a surveillance tape without sound—he suggests that he was a perfect gentleman. The defendants allege that Shannon's characterization of the events contradict his own testimony that he was drunk, belligerent, and using profanity. The defendants also claim the surveillance video shows that Shannon was highly aggressive and had a belligerent attitude. The defendants argue that the question of whether Shannon assaulted Koehler is a fact question, but regardless of whether an assault took place, Shannon's behavior, training in defensive tactics, and his level of intoxication cause Koehler's actions to be reasonable under the standards articulated by excessive force jurisprudence. Docket no. 46-2 (citing *Wertish v. Krueger*, 433 F.3d 1062, 1066-67 (8th Cir.2006); *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004); *Lawyer v. City of Council Bluffs*, 361 F.3d 1099, 1105 (8th Cir. 2004).

   Concerning Shannon's claim that excessive force was also used after Shannon was on the floor, the defendants argue that Shannon aggressively avoided being handcuffed by tucking his right arm beneath his body and that Koehler had to use necessary efforts to gain control of Shannon's right arm. These efforts included lifting Shannon off the ground to pull out his arm. The defendants claim that Shannon was convicted of interference with official acts precisely because of these actions. According to the defendants, Koehler

entered a dark bar at 1:45 a.m. knowing there were physical injuries and that Shannon had touched or grabbed one of the females, and then was, at a minimum, verbally assaulted by a known former law enforcement officer with defensive tactics training, who was highly intoxicated. The defendants argue that Koehler made a split-second judgment that was reasonable from the perspective of an officer at the scene.

      *iv.*    **Oral arguments**. While conceding that whether Shannon poked Koehler is a fact question, the defendants' counsel contested whether the question was material. According to counsel, Koehler's use of force in arresting Shannon was reasonable regardless of whether Shannon made contact with Koehler, because Koehler was in a dark bar at 1:45 a.m., responding to a report of an injured party, informed that there was a disturbance, told at the door of the bar that a male had touched or grabbed one of the females, unaware of how many people were in the bar at that time, and confronted by an obviously intoxicated and infuriated Shannon. In addition, counsel claimed that Koehler knew that Shannon was a trained former officer. Counsel also alleged that Koehler told Shannon that he was in the bar to help, even though this claim was not previously argued. Counsel was unable to identify where the record supported his claim that Koehler stated he was in the bar to help Shannon.[9]

      The defendants' counsel also argued that Shannon was resisting arrest after he was taken to the ground and Koehler needed to use additional force to secure his arrest.

---

[9] The court notes that Navrkal stated, in an audiotape statement to the police, that Koehler told Shannon upon his arrival: "I'm here to help you, somebody called." Plaintiff's App. at 301. Navrkal states that Murad replied, "I'm the girlfriend, I called." *Id.* In addition, Jill Murad's statement claims: "the police arrived first so I let them in the bar. I had told them that Tim's head needed to be checked out. . . ." Defendants' App. at 36.

Counsel claimed that Koehler stopped using force once he was able to secure the handcuffs.

Shannon's counsel asked the court to look at the facts in the light most favorable to Shannon. In doing so, counsel claims that Koehler used force on Shannon, at least in part, due to his profanity and argues that was insufficient grounds to use the force that he did. According to counsel, Koehler was not investigating a severe crime, Shannon was not a threat to Koehler's safety, or that of Navrkal and Murad, and Shannon never attempted to flee or resist arrest. Counsel also emphasized that Shannon has provided evidence of more than *de minimus* injury resulting from Koehler's alleged use of excessive force. According to counsel, Koehler had many options that he could have pursued rather than a take down, such as displacing.

Once Shannon was on the ground, counsel claims that Koehler used excessive force in securing his arrest. Although Shannon has been found guilty of interference with official acts, counsel argues that the elements of interference with official acts under Iowa law[10] are slightly different from the elements of excessive force and that he should be able to present this argument to the jury.

---

[10] Iowa's law prohibiting interference with official acts states, in pertinent part:
A person who knowingly resists or obstructs anyone known by the person to be a peace officer . . . in the performance of any act which is within the scope of the lawful duty or authority of that officer . . . , commits a simple misdemeanor.
. . .
The terms "resist" and "obstruct", as used in this section, do not include verbal harassment unless the verbal harassment is accompanied by a present ability and apparent intention to execute a verbal threat physically.

IOWA CODE § 719.1(1, 3) (2008).

### b.    Analysis

The court's initial inquiry in deciding whether Koehler is entitled to qualified immunity is to determine whether there was even a constitutional violation. *Krout*, 2009 WL 3172180 at 4 (Explaining the initial inquiry in a qualified immunity analysis as "whether the facts alleged or shown, construed in the light most favorable to [the nonmoving party], establish a violation of a constitutional or statutory right. . . ."). "In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 1870 (U.S.,1989) (citations omitted). If "the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." *Id.* at 394, 1871. Such claims should be "analyzed under the Fourth Amendment and its 'reasonableness' standard. . . ." *Id.* at 395, 1871; *see also Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009).

"To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances." *Brown*, 574 F.3d at 496 (quoting *Henderson v. Munn*, 439 F.3d 497, 502 (8th Cir. 2006) in turn quoting *Littrell v. Franklin*, 388 F.3d 578, 583 (8th Cir.2004) and *Greiner v. City of Champlin*, 27 F.3d 1346, 1354 (8th Cir.1994)). It is well settled that this reasonableness standard "is viewed from the vantage point of the police officer at the time of arrest or seizure." *Gill v. Maciejewski*, 546 F.3d 557, 562 (8th Cir. 2008) (citing *Wertish*, 433 F.3d at 1066); *see also Billingsley v. City of Omaha*, 277 F.3d 990, 993 (8th Cir. 2002) ("The aforementioned reasonableness

of force is judged from the perspective of the officer on the scene, taking into consideration the facts known to him, as opposed to one possessing the illuminating power of hindsight.") (citing *Nelson v. County of Wright*, 162 F.3d 986, 989 (8th Cir.1998)); *Nelson*, 162 F.3d at 990 ("The issue of reasonableness must be examined from the perspective of the facts known to the officer at the time of the incident.") (citing *Schulz v. Long*, 44 F.3d 643, 648 (8th Cir.1995)). "This calculus allows 'for the fact that police officers are often forced to make split-second decisions—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Brown*, 574 F.3d at 496 (quoting *Graham*, 490 U.S. at 397, 109 S.Ct. 1865). "'Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Howard v. Kansas City Police Dept.*, 570 F.3d 984, 989 (8th Cir. 2009) (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865). "Circumstances relevant to the reasonableness of the officer's conduct include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865). The court may also "consider the result of the force," *id.* (citing *Littrell*, 388 F.3d at 583), "the extent of the suspect's injuries," *Mann v. Yarnell*, 497 F.3d 822, 826 (8th Cir. 2007) (citing *Crumley v. City of St. Paul, Minn.*, 324 F.3d 1003, 1007 (8th Cir. 2003)), "as well as standard police procedures." *Mann*, 497 F.3d at 826 (citing *Ludwig*, 54 F.3d 465, 472 (8th Cir. 1995)). "Ultimately, the reasonableness of the force applied must be judged from the perspective of a reasonable officer on the scene 'rather than with the 20/20 vision of hindsight.'" *Id.*

(citing *Graham*, 490 U.S. at 396, 109 S.Ct. 1865). Shannon has alleged that Koehler used excessive force in both taking him down and after he was on the floor.

   ***i. Severity of the crime***. Koehler was dispatched to investigate "an injured party and a disturbance between two females." Defendants' App. at 89. Once Koehler entered the bar, he was told "something about one of the females being touched or grabbed by the male, who was in the bar,"[11] Defendants' App. at 68; docket no. 40-2, or told that he needed to check Shannon's head[12]. *See* Defendants' App. at 87. As Koehler progressed into the bar, there were no indications that this disturbance was serious and nothing occurred that would have drastically altered the severity of the potential crimes at issue. Instead, Navrkal and Shannon, who were already near the center of the bar, did not act alarmed and there is no evidence that any of the parties were a victim of a violent crime. Although Murad appears to yell at Shannon once she and Koehler reach the center of the establishment, and Shannon yells at Koehler, the yelling does not evidence the

---

[11] Shannon claims that he is unable to admit or deny the veracity of Koehler's claim that Murad stated this as Koehler entered the bar, as Shannon did not hear it and Murad does not remember whether she made the statement. *See* docket no. 40-2. This statement would have been made near the front door of Tom Foolery's while Shannon "was at the south end behind the bar, south end of the bar, still behind the bar." Plaintiff's App. at 58.

[12] The defendants claim that Murad informed Koehler, upon his arrival at the bar, that a female had been touched or grabbed by the male in the bar. This general statement is in Koehler's offense report, Defendants' App. at 68, and his affidavit. Defendants' App. at 90. However, the following exchange occurred at Koehler's deposition:

  Q. Okay. Did Jill [Murad] say anything to you when you arrived at the door?
  A. Yes. She said I need you to check his head.
  Q. Did she say anything else?
  A. Not that I recall, no.
Defendants' App. at 87.

commission of a severe or violent crime—viewing the facts in the light most favorable to Shannon.

The defendants insist that, for this factor, the court should consider assault on a police officer as the crime at issue. This court does not hold that the assault Shannon allegedly committed was minor, if proven—any assault on a police officer is a serious matter. However, the court cannot conclude, as a matter of law, that Shannon made contact with Koehler. Even if the court considered Navrkal's testimony that Shannon tried to "attack" Koehler, or "slammed" Koehler before Koehler took him down, *see* Defendants' App. at 301 (Navrkal recording), Shannon claims that he did not touch Koehler. *See* Plaintiff's App. at 114 ("At no time did I ever touch or poke Koehler with two fingers, any other part of my body, nor did I thereafter attempt to do so."); Defendants' App. at 59 (Shannon states, "I did not touch him [(Koehler)]"in response to the question, " . . . do you recall poking him in the chest, striking him?"). The defendants may desire the court to believe Navrkal's statements—that allegedly were excited and contained other indicia of reliability—over Shannon's statements, which describe events that occurred while Shannon was intoxicated, are self-interested, and concern a time period immediately before Shannon's memory ceases to function. *See* Defendants' App. at 59 ("Q. . . .you said your memory stops at the point that you take the blow to your head? A. Yes. There is no memory. I am knocked out. Memory ceases to function."). Yet, the video does not provide evidence of a shove or a poke that would cause the court to find Shannon's claim, that he did not poke Koehler, without a basis in the record. Without such a finding, the court would need to make an impermissible credibility determination between Navrkal's and Shannon's statements, in order to find that the alleged touching occurred. The parties dispute whether Shannon made contact with Koehler, and this is a determination properly left to the jury. *See Anderson*, 477 U.S. at 248-49 (a genuine issue

of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial"). Even if the defendants could identify a crime for which Koehler had probable cause, or arguable probable cause, to arrest Shannon prior to performing the take down, there is no evidence in the record that such an alleged crime would be severe.

Shannon also alleges—as a separate instance of excessive force—that Koehler used excessive force once Shannon had been taken to the floor. Shannon admits that he was convicted of interference with official acts as a result of his actions on September 13, 2006. *See* Defendants' App. at 81. Despite this conviction, the record only establishes that the crime at issue was a misdemeanor and not severe, when considering the potential range of severity. The severity of the crime at issue is only one of multiple circumstances the court must consider in determining whether Koehler used excessive force as a matter of law. *See Howard*, 570 F.3d at 989 (citations omitted).

    *ii.*    ***Threat to Koehler or others***. The court next considers whether the suspect posed an immediate threat to the safety of the officers or others. In this case, the potential threat Shannon posed before the take down differs, again, depending on whether Shannon took the additional step of making contact with Koehler—jabbing Koehler. Even if a minor crime was at issue, Koehler was aware that there was a disturbance, an injury, and that a male in the bar touched or grabbed a female. *See* Defendants' App. at 68; docket no. 40-2. In addition, the bar had only a few lights on inside. *See id.* ("It is denied that the bar was dark. There were a few lights on inside the pub before Koehler arrived, and after he arrived the pub was lit with the lights from his vehicle, and the light from his flashlight provided a lot of illumination of the room."); Defendants' App. at 304 (surveillance video of bar). It is also undisputed that Shannon swore at Koehler while speaking to him and told him to leave, *see* docket no. 40-2; stated, "I'm Tim Shannon, I own this bar, get out,"

and asked for a warrant, *id.*; and probably came up to Koehler and told him to "get out . . . I don't need you . . . I don't want you in here . . . I don't need you, get out." *Id.* In addition, Shannon approaches Koehler while yelling.  On the other hand, Shannon claims that Koehler asked him to approach,[13] Plaintiff's App. at 160, p. 17, and absent any physical contact, Shannon might reasonably be viewed as an intoxicated individual who is simply acting intoxicated and approaching the officer, as he requested.  Koehler's "leg sweep," as shown on the surveillance video, was clearly forceful, and the court cannot determine as a matter of law that Shannon provided such a great threat that Koehler's take down was objectively reasonable.

In *Brown v. City of Golden Valley*, the Eighth Circuit Court of Appeals recently evaluated the extent of the threat necessary to provide an officer with qualified immunity, when the suspect was thought to have only committed a minor, nonviolent, crime.  *See Brown v. City of Golden Valley*, 574 F.3d 491, 497 (8th Cir. 2009).  In *Brown*, the officer used a taser gun on an arrestee who had committed a misdemeanor open bottle violation. *Id.*  In its analysis, the court primarily relied on two cases where officers had used significant force to obtain an arrest when a minor crime was at issue:  *Lawyer v. City of Council Bluffs*, 361 F.3d 1099 (8th Cir. 2004) and *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004).  In *Lawyer*, the court found that officers did not use excessive force when spraying pepper spray on a driver who had refused to sign his speeding citation, because the driver had begun to roll up his window on the officers arm.  The *Lawyer* court

---

[13] It is unclear whether Koehler claims that he asked Shannon to stop approaching him or only to stop poking him.  *See* Plaintiff's App. at 88(a), p. 23 (Q.  . . . When you asked him to stop approaching you and pointing at you and poking you, did he comply with your verbal commands to stop?  A.  No.").

reasoned that the officer "faced the possibility that he could be dragged down the road with his arm trapped in the window if the vehicle began to move." *Id.* at 498 (citing *Lawyer*, 361 F.3d at 1105). In *Lawyer*, the suspect "posed an immediate threat to the officer's safety, and the circumstances were 'tense, uncertain, and rapidly evolving.'" *Id.* (citing *Graham*, 490 U.S. at 397, 109 S.Ct. 1865).

In *Draper*, the court found that an officer's actions in using a taser gun to arrest a driver who had a tag light that was not properly illuminated were objectively reasonable. *Id.* (citing *Draper*, 369 F.3d at 1272, 1278). The police camera had recorded the arrestee in *Draper* being "hostile, belligerent, and uncooperative." *Id.* (citing *Draper*, 369 F.3d at 1273, 1278). The *Brown* court explained the *Draper* plaintiff's actions prior to the use of force:

> Draper paced back and forth behind his truck, yelling at [the officer], and refused to comply with five commands to retrieve certain documents from his truck. [*Draper*, 379 F.3d] at 1273. [The officer] finally Tasered Draper, and the back-up officer, who had arrived at about the time of the Tasering, handcuffed him. *Id.* at 1273-74. After Draper was handcuffed, [the officer] stated that he thought Draper was going "to fight me." *Id.* at 1274.

*Id.*

In contrast to *Lawyer* and *Draper*, the *Brown* court found that the facts of the arrestee plaintiff before it were distinguishable, as she was "a frightened passenger who had disobeyed two orders to end her phone call with a 911 operator, and four officers were handling the traffic stop." *Id.* The court further explained that:

> Draper, on the other hand, was behind his truck, pacing, yelling, and swearing at [the officer], who at the time was the only officer on the scene. Draper posed a realistic threat to [the officer's] safety, but accepting [the Brown court

> arrestee's] version of the facts as true, she posed no similar
> threat to [the officer].

*Id.*

Like the officer in *Draper*, Koehler was the only officer on the scene at the time of the takedown, while there were four officers present in *Brown*. As a result, Koehler, alone, had to diffuse any potential threat without the assistance of other officers. Concerning the actual threat, Shannon, like the plaintiff in *Draper*, had also—admittedly—yelled, and swore, at Koehler:

A.     I left from behind the bar and proceeded up. I told him I didn't need him, he could leave.

Q.     Do you recall swearing at him in any fashion or yelling at him?

A.     No, but it is probable. I mean you have an officer inside your business that is closed, you have no knowledge of anybody calling him. There is no problem. There is no need. There was no violations being done. It was—and I know him. I can see just by sitting here and watching his eyes, the way he looks at me he is not one I wanted to come and protect and serve me. So I asked him and told him to leave. I think I told him strongly. But profanity, it is probable, but so what? It is freedom of speech right behind the other amendment.

 . . .

I probably come up and said get out. I don't need you. I don't want you in here. You know, I don't need you, get.

Defendants' App. at 58-59. However, in *Draper*, the plaintiff was "yelling at [the officer]" and "refus[ing] to comply with [the officer's] commands." *Draper*, 379 F.3d at 1273. According to Shannon, he followed Koehler's command that he approach Koehler.

In addition to allegedly following Koehler's commands to approach him, Shannon did not pose as much of a threat as the plaintiffs in *Lawyer* and *Draper*—absent a finding that Shannon made contact with Koehler, due to those courts' findings related to the likelihood that a party would be injured. In *Lawyer*, the court considered that the officer "faced the possibility that he could be dragged down the road with his arm trapped in the window if the vehicle began to move." *Id.* at 498 (citing *Lawyer*, 361 F.3d at 1105). The court found that, therefore, the suspect "posed an immediate threat to the officer's safety, and the circumstances were 'tense, uncertain, and rapidly evolving.'" *Id.* (citing *Graham*, 490 U.S. at 397, 109 S.Ct. 1865). In *Draper*, the court found that the officer may have had to fight the plaintiff. *See Brown*, 574 F.3d at 497. In this case, whether Shannon made contact with Koehler affects whether Koehler reasonably should have had a similar concern for his safety or that of Navrkal and Murad, who were standing right next to him. A reasonable juror could determine that Shannon was simply an intoxicated individual who was refusing to quiet down when Koehler was speaking to him. Or, a reasonable juror could find that Shannon had jabbed Koehler in the chest and that Shannon "posed an immediate threat to the officer's safety, and the circumstances were 'tense, uncertain, and rapidly evolving.'" *Brown*, 574 F.3d at 497 (citing *Graham*, 490 U.S. at 397, 109 S.Ct. 1865). Again, the court will not decide this genuine issue of material fact. *See Quick*, 90 F.3d at 1376-77 (Rather than "attempt[ing] to determine the truth of the matter . . . the court's function is to determine whether a dispute about a material fact is genuine.").

Once Shannon was on the ground, he was hardly a threat to Koehler. Rather, the record shows that Koehler was on top of Shannon and that Shannon did not pose a threat to Koehler, Navrkal, or Murad. Even if Shannon was resisting Koehler's efforts to arrest him, the defendants only allege that Shannon provided passive resistance by tucking his arm under his body. There is no evidence in the record that Shannon was trying to escape

Koehler or harm him at that point. Viewing the record in the light most favorable to Shannon, it does not support a finding that Shannon was a threat to Koehler or others once he had been taken to the ground.

*iii.* ***Resisting arrest***. The court may also consider whether the plaintiff was "actively resisting arrest or attempting to evade arrest by flight." *Howard*, 570 F.3d at 989 (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865). The defendants do not claim that Shannon resisted arrest or attempted to evade arrest prior to being taken down—the defendants were unable to identify evidence in the record that showed Koehler told Shannon he was under arrest prior to being taken down.

Shannon claims that Koehler continued to use excessive force once Shannon was on the floor—Koehler claims that Shannon tucked his right arm beneath his body. Because of this alleged resistance, the defendants claim that Koehler needed to lift Shannon off the ground in order to handcuff his second arm. Shannon, however, claims that Koehler repeatedly smashed his head into the floor, drove his knee into Shannon's back, and turned Shannon 270 degrees.

The surveillance video captures Koehler's actions in arresting and eventually handcuffing Shannon. However, the video does not make clear when Shannon ended any alleged resistance[14], whether Koehler applied gratuitous force after the alleged resistence

---

[14]   Even though Shannon was convicted of interference with official acts, the parties have not sufficiently discussed the conviction and the basis for the conviction for this court to give preclusive effect to any issues of fact related to the conviction. *See Plough By and Through Plough v. West Des Moines Community School Dist.*, 70 F.3d 512, 516 (8th Cir. 1995) ("Under Iowa law, issues of fact are given preclusive effect if: (1) the issue of fact concluded is identical to that concluded in the prior action; (2) the issue of fact was raised and litigated in the prior action; (3) the issue of fact was material and relevant to the disposition of the prior action; and (4) the determination made of the issue of fact in the

(continued...)

ended, and whether Shannon was fully subdued due to the fall.  Because of these disputes, Shannon has generated genuine issues of material fact concerning whether he resisted arrest or whether some of the force used on him, once he was on the floor, was gratuitous, *see Krout*, 583 F.3d at 566 (discussing the use of gratuitous force on a suspect who was handcuffed, not resisting, and fully subdued), and these determinations are properly left to the jury in this case.  *See Quick*, 90 F.3d at 1376-77.

      *iv.*    ***Other factors***.  The court may also "consider the result of the force," *id.* (citing *Littrell*, 388 F.3d at 583), "the extent of the suspect's injuries," *Mann*, 497 F.3d at 826 (citing *Crumley*, 324 F.3d at 1007), "as well as standard police procedures," *Mann*, 497 F.3d at 826 (citing *Ludwig*, 54 F.3d at 472), in the totality of the circumstances when determining whether the use of force was reasonable.  Shannon allegedly suffered from atelectasis in the base of the left lung, multiple fractured ribs, a contusion to the head, a five centimeter laceration to the head, bruising on the left leg, left shoulder, left arm, and pelvis/hip, and a laceration to the right shoulder, due to Koehler's actions.  The defendants dispute whether Shannon suffered from these injuries and the extent to which they were caused by Koehler's arrest, rather than Shannon's previous fall to the ground.  In addition, the record is not clear concerning which injuries, if any, were caused by the take down and which were caused by Koehler's use of force once Shannon was on the floor.

Shannon also argues that Koehler's alleged "leg sweep" was done improperly and that Koehler should have grabbed the finger of his weak hand, bent the finger back in the opposite direction, and stepped back or to the side, rather than throwing Shannon to the

---

[14](...continued)
prior action was necessary and essential to the resulting judgment.) (citing *Yancy v. McDevitt*, 802 F.2d 1025, 1027-28 (8th Cir.1986), in turn citing *Hunter v. City of Des Moines*, 300 N.W.2d 121, 123 (Iowa 1981)).

ground. Similarly, the parties dispute whether Koehler properly obtained Shannon's second arm or whether Koehler should have waited for help, which arrived seconds after Koehler finished handcuffing Shannon. These are additional disputes that prevent this court from granting the defendants' motion for summary judgment.

     *v.*     ***Reasonableness of the force used***. The court, in considering the relevant circumstances surrounding Shannon's arrest, finds that genuine issues of material fact exist concerning whether Koehler's use of force was objectively reasonable—whether Koehler violated Shannon's Fourth Amendment right "'to be secure in their persons . . . against unreasonable . . . seizures' of the person." *Graham*, 490 U.S. at 394, 109 S.Ct. at 1871. Concerning Koehler's alleged use of excessive force in taking down Shannon, disputes exist concerning whether Shannon made contact with Koehler prior to the takedown, whether the takedown was appropriate and administered in accordance with police procedures, and the extent of Shannon's injuries resulting from the take down.

     Once Shannon was on the ground, the alleged crime at issue was misdemeanor interference with official acts and, at that time, there is no evidence that Shannon posed a threat to the safety of Koehler or others. However, disputes exist concerning when any alleged resistance by Shannon ceased and what force was used after resistance ceased, whether Shannon was fully subdued at any point before the force ended, and whether police procedures would have instructed Koehler to wait for backup, which was arriving, to further secure Shannon's other arm. These disputes prevent the court from granting the defendants' motion in regard to the excessive force claims, as there is "sufficient evidence

supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial."[15] *Anderson*, 477 U.S. at 248-49.

### 2. *Reasonable official standard*

#### a. *Arguments of the parties*

The defendants claim that Shannon cannot show that a reasonable officer in Koehler's position "would have clearly understood that he was under an affirmative duty to have refrained from administering a leg sweep in these circumstances." Docket no. 31-7 (quoting *Wallace v. City of Shelby*, 968 F.Supp. 1204, 1211 (N.D.Ohio 1997)). However, Shannon claims that Koehler was aware that a disproportionate level of force is contrary to law. Docket no. 40 (citing *Jackson v. Crews*, 873 F.2d 1105, 1108 (8th Cir. 1989)).

---

[15] The court notes that it might submit a special interrogatory, or interrogatories, at trial. The Eighth Circuit Court of Appeals has explained:

> The issue of qualified immunity . . . is frequently intertwined with unresolved factual questions. Where, as in this case, factual questions prevent a district court from ruling on the issue of qualified immunity, it is appropriate to tailor special interrogatories specific to the facts of the case. This practice allows the jury to make any requisite factual findings that the district court may then rely upon to make its own qualified immunity ruling.

*Littrell*, 388 F.3d at 585. In this case, special interrogatories would allow the jury to determine the factual issue of, for example, whether Shannon poked Koehler once, or twice, before Koehler took down Shannon. With the jury's findings concerning any special interrogatories, and the trial record, the court will be better positioned to decide the question of qualified immunity as a matter of law. *See Littrell*, 388 F.3d at 584-85 ("The law of our circuit is clear. The issue of qualified immunity is a question of law for the court, rather than the jury, to decide.")

At oral arguments, the defendants' counsel argued that *Saucier*, 533 U.S. 194, 121 S.Ct. 2151, explains that officers should be protected when their actions fall in the hazy boarder between excessive and acceptable force. Counsel emphasized that the circumstances, even assuming that Shannon did not make contact with Koehler, warranted Koehler's use of force. Counsel also claimed that Koehler could not have backed up, in response to the court's questions in that regard, because backing up would have been inconsistent with his training.

Shannon's counsel claimed that the clearly established law does not need to be analogous case law. Instead, counsel argues that the court should view the facts of the case and determine whether a reasonable officer would have known the actions were unlawful.

### b.    Analysis

The court now turns to its second inquiry, whether the alleged "constitutional right was clearly established as of [the date of the alleged incident], such that a reasonable official would have known that his actions were unlawful." *Krout*, 2009 WL 3172180 at 4 ("To determine whether the defendants are entitled to qualified immunity, we ask (1) whether the facts alleged or shown, construed in the light most favorable to [the nonmoving party], establish a violation of a constitutional . . . right, and (2) whether that constitutional right was clearly established as of [the date of the alleged incident], such that a reasonable official would have known that his actions were unlawful.") (citing *Pearson*, 129 S.Ct. at 815-16). "The right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person." *Howard*, 570 F.3d at 991 (citing *Mann*, 497 F.3d at 825 in turn quoting *Guite v. Wright*, 147 F.3d 747, 750 (8th Cir.1998)). "The key distinction between the reasonableness inquiry and the one made under the first step of the qualified immunity

analysis is that the right allegedly violated must be defined at the appropriate level of specificity before a court can determine it was clearly established." *Id.* (citing *Moore v. Indehar*, 514 F.3d 756, 763 (8th Cir. 2008) in turn quoting *Craighead v. Lee*, 399 F.3d 954, 962 (8th Cir.2005)). This level of specificity does "not require that there be a case with materially or fundamentally similar facts." *Brown*, 574 F.3d at 499 (citing *Brown v. Fortner*, 518 F.3d 552, 561 (8th Cir.2008)). Instead, "[t]he relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (quoting *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151).

The Eighth Circuit Court of Appeals has explained:

> The right to be free from excessive force in the context of an arrest is clearly established under the Fourth Amendment's prohibition against unreasonable searches and seizures. *Graham*, 490 U.S. at 396, 109 S.Ct. 1865; *Henderson*, 439 F.3d at 503; *Kukla v. Hulm*, 310 F.3d 1046, 1050 (8th Cir.2002); *Guite v. Wright*, 147 F.3d 747, 750 (8th Cir.1998). Moreover, it is clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public. *Casey* [v. City of Federal Heights], 509 F.3d 1279, 1278 (10th Cir. 2007) (citing *Graham*, 490 U.S. at 396, 109 S.Ct. 1865); *Kukla*, 310 F.3d at 1050 (citing *Graham*, 490 U.S. at 396, 109 S.Ct. 1865); *see also Henderson*, 439 F.3d at 503.

*Id.* Shannon has properly supported, for this motion for summary judgment, his allegations that he was simply a nonviolent misdemeanant, at most; did not flee or actively resist arrest; and posed little or no threat to Koehler's security or that of Navrkal and Murad. Although the defendants argue that Koehler's actions were within the "hazy border between excessive and acceptable force" recognized in *Saucier*, *see Saucier*, 533 U.S. at 206, 121 S.Ct. at 2158 ("Qualified immunity operates in this case, then, just as

it does in others, to protect officers from the sometimes "hazy border between excessive and acceptable force," *Priester v. Riviera Beach*, 208 F.3d 919, 926-927 (C.A.11 2000), and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful."), *Brown* states that force is least justified in the circumstances before the court, yet Koehler performed a forceful take down procedure followed by additional force when placing handcuffs on Shannon. The court must view the record in the light most favorable to Shannon, *see Matsushita*, 475 U.S. at 587-88 (when considering whether a genuine issue of material fact is present the court must view all the evidence in the light most favorable to the nonmoving party), and finds that Koehler was on notice that his actions, as viewed by the court for this motion, were unlawful. *See Brown,* 574 F.3d at 499. This is especially true because the court is not convinced that Koehler had even arguable probable cause to arrest Shannon at the time he initiated the leg sweep take down procedure on him.[16]

---

[16] The presence of probable cause, or arguable probable cause—as opposed to a lack of even probable cause—seems undeniably relevant to whether the force used in an arrest is reasonable, because the government does not have an interest in arresting citizens when there is not even arguable probable cause that they committed a crime. *See Graham*, 490 U.S. at 396, 109 S.Ct. at 1871 ("Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake.") (citing *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 1699 (1985), quoting *United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983)). Similarly, the "severity of the crime at issue," *see id* at 1972 (citing *Garner*, 471 U.S., at 8-9, 105 S.Ct., at 1699-1700), is nil if an officer has no arguable probable cause that a crime has been committed. In this case, the defendants argue that Koehler had probable cause to arrest Shannon, prior to the take down, because of his alleged assault on a police officer, when he allegedly made contact with Koehler. As discussed above, this court cannot find that Shannon made

(continued...)

## D.  *Monell* Liability[17]

### 1.    *Arguments of the parties*

#### a.    *The defendants' initial arguments*

The defendants claim that the City and Chief Frisbie will only be liable if Koehler

is liable—the defendants allege that Koehler's actions were constitutional and that he is not

liable.    However, the defendants also allege that, even if Koehler's actions were

unconstitutional, Shannon cannot meet his very significant burden of establishing the

existence of an unconstitutional policy or custom under *Monell*.  First, the defendants

allege that Shannon is unable to prove that the procedures adopted by the City violate

---

[16](…continued)

contact with Koehler for purposes of this summary judgment motion.  In addition, the defendants were unable to identify an objectively reasonable basis for Koehler's decision to arrest Shannon, prior to taking him to the floor.  Nevertheless, the court does not rely on its finding—that the summary judgment record lacks a basis for arguable probable cause for arresting Shannon prior to the take down—when determining that Shannon has generated a genuine issue of material fact concerning whether Koehler's use of force was objectively reasonable, as the Eighth Circuit Court of Appeals has called into question the relevance of probable cause in deciding an excessive force claim.  *See Habiger v. City of Fargo*, 80 F.3d 289, 297-98 (8th Cir. 1996) (Affirming the use of a jury instruction on an excessive force count that prohibited the jury from considering whether plaintiff's arrest was valid); *see also id.* at 298, n. 8 ("Indeed, we are inclined to believe that the presence of actual or arguable probable cause is irrelevant to the objective reasonableness of the force used to effect an arrest.  That is, if the identical force is used to arrest two defendants suspected of committing the identical crime, the objective reasonableness of the use of force does not depend on whether the arrest was based on actual or arguable probable cause.").

[17]  *See Monell v. N.Y. Dep't of Soc. Servs.*, 436 U.S. 658, 690-92, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).  "To establish municipal liability under § 1983, a plaintiff must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity." *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009) (citing *Monell*, 436 U.S. at 690-92, 98 S.Ct. 2018, 56 L.Ed.2d 611).

federal law or direct its employees to do so. Rather, the defendants argue that the official policies adopted by the City are facially lawful and do not compel unconstitutional action by an employee. As a result, the defendants allege that the City's policy may only give rise to liability where its inaction "reflects a deliberate indifference to the constitutional rights of the citizenry, such that the inadequate training or supervision actually represents the city's 'policy.'" Docket no. 31-7 (citing *Szabla v. City of Brooklyn Park, Minnesota*, 486 F.3d 385, 392 (8th Cir. 2007)). The defendants describe Koehler's training and allege that it does not evidence that the City failed to train its officers in the proper exercise of their discretion.

The defendants also claim that Shannon cannot show that the City has a history of police officers transgressing the rights of criminal suspects during their investigations and that the City has a history of failing to discipline officers who violate these constitutional rights. According to the defendants, Shannon must prove that the complaints had merit and cannot simply rely on the number of complaints. According to the defendants, officers from the SCPD made 6,366 arrests in 2004; 5,860 arrests in 2005; 5,627 arrests in 2006; 5,682 arrests in 2007; and 5,420 arrests in 2008. Yet, the defendants allege that a small number of reports of excessive force have been received: only 6 complaints for excessive force or physical abuse in 2004; 11 in 2005; 3 in 2006; 3 in 2007; 2 in 2008; and none in 2009, as of the time the defendants' brief was filed. The defendants claim that this small percentage of complaints relative to the number of arrests during this time period does not equate to a history of the police department transgressing the rights of its citizenry. In addition, the defendants allege that the SCPD is accredited by CALEA and has been since the year 2000.

### b. *Shannon's arguments in response*

Shannon clarifies that he is not asserting that Koehler was mis-trained or untrained, or that the techniques taught to Koehler were themselves inadequate. Shannon is also not claiming that the City's policy on the use of force or its complaint procedure is facially unconstitutional as written or articulated, since both seek to investigate, prevent, and punish excessive force. Instead, Shannon claims that the City had a custom of failing to investigate and remedy past instances of excessive force in place on September 13, 2006, which was unconstitutional[18]. Shannon argues that the facially constitutional policy has been consistently implemented to allow misconduct and instances of excessive force. According to Shannon, the City and Chief Frisbie ratified the use of excessive force by failing to discipline instances of excessive force—the City and Chief Frisbie were on notice of the excessive force violations prior to September 13, 2006, yet failed to stop them.

First, Shannon claims that similar incidents of police misconduct may be sufficient to support a finding of a municipal policy or custom. Docket no. 40 (citing *Leach v.*

---

[18] Shannon claims that he must satisfy three requirements to show the existence of such a municipal custom:

> (1)    The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
> (2)    Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of the misconduct; and
> (3)    Injury by acts pursuant to the governmental entity's custom, i.e., proof that the custom was the moving force behind the constitutional violation.

Docket no. 40 (citing *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999) (citations omitted).

*Shelby County Sheriff*, 891 F.2d 1241, 1247 (6th Cir. 1989) (policy of indifference to paraplegics shown by 14 past instances of failing to provide medical attention)). Shannon alleges that from 2001 to 2008 there have been 42 complaints of excessive force levied against members of the SCPD and that none of the complaints investigated by the lieutenant in charge of the professional standards unit were sustained on the allegation of excessive force. Shannon claims that Joseph Stine, an alleged policies and practices expert, reviewed each of the underlying complaints at issue and concluded that the SCPD was not held accountable for improper practices and occasionally illegal practices in several incidents and that other incident investigations resulted in inappropriate dispositions.

Second, Shannon claims that statistical evidence can also constitute sufficient evidence of an unconstitutional policy or custom. *Id.* (citing *Shaw v. Stroud*, 13 F.3d 791, 800 (4th Cir. 1994); *Wahhab v. City of New York*, 386 F.Supp.2d 277, 285 (S.D.N.Y., 2005 (statistical evidence regarding a failure to train precluded grant of summary judgment)). Shannon claims that Dr. Zhongming Huang, an alleged expert in mathematics and statistics, reviewed the 42 complaints and prepared a report regarding his findings. Shannon claims that Huang concluded that, at the intake point, the excessive force complaint process was adequate. However, Shannon claims that Huang also found that the zero percent of excessive force complaints being sustained was statistically unlikely—based on the national result in the 2006 Department of Justice Report, Huang opined the probability that any one complaint will be sustained is nine percent and that three or four complaints would be expected to have been sustained out of the 42 complaints reviewed.

Third, Shannon argues that the methodology of the investigations, including the failure to discipline, also evidences deliberate indifference on the part of the City and Chief Frisbie. Stine analyzed the methodology of the investigations. Stine found that, in the

investigation of 37 of the 42 complaints, interviews were recorded but not transcribed. This is allegedly a problem because the investigating lieutenants paraphrase or summarize the interviews. The lack of a transcript causes the interviews to be unverifiable and insulates a superior or investigator who wants to review the results—unless the investigator conducts his or her own investigation. Stine was also critical of the lack of canvassing by the investigator. Similarly, investigators sometimes failed to interview even identifiable and known witnesses. The complaints also contained factual inconsistencies that were never resolved. In fact, Stine alleges that the investigating lieutenants would coach and/or actually supply, the officer under investigation, answers beneficial to the officer. According to Stine, the above deficiencies in the investigation process demonstrate that the investigations are not done in a manner that is consistent with generally accepted practices and procedures for professional police departments. Shannon argues that this amounts to deliberate indifference "to the constitutional rights of persons with whom the police come into contact." *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Shannon claims that Chief Frisbie, as Chief of Police, is responsible for disciplining police personnel and that the city is liable for Chief Frisbie's deliberate indifference to the excessive force investigations.

Shannon claims that the above argued custom caused the deprivation of Shannon's constitutional rights—it "was the moving force behind the constitutional violation." *Id.* (citing *Rogers v. City of Little Rock, Ark.*, 152 F.3d 790, 799 (8th Cir. 1998) (quoting *Jane Doe A. v. Special Sch. Dist.*, 901 F.2d 642, 646 (8th Cir. 1990)). In fact, Shannon claims that it has been decided as a matter of law, that failure to discipline will lead to more violations. *Id.* (citing *Harris v. City of Pagedale*, 821 F.2d 499, 501-05 (8th Cir. 1987) (finding a plaintiff had proven a municipal custom through the presentation of detailed evidence regarding the particular police officer's previous misconduct, and the

city's failure to investigate or punish that conduct), *cert. denied*, 484 U.S. 986, 108 S.Ct. 504, 98 L.Ed.2d 502 (1987)). Shannon also argues that Koehler had been investigated six times for misconduct—two of which involved excessive force—and, therefore, Koehler was acquainted with these methods of inadequate investigation.

Shannon claims that he has established a genuine issue of material fact as to the existence of a continuing, widespread, persistent pattern of excessive force violations by City employees. Shannon argues that Chief Frisbie, as a policy making official for the City, has shown deliberate indifference or tacit authorization of this conduct and that Shannon's excessive force complaint and injuries are of the same species that made up the past persistent pattern. Further, Shannon claims that this pattern was the moving force behind Koehler's unconstitutional use of force against Shannon, as Koehler used excessive force because he knew that he would not be disciplined for it.

### c. *The defendants' reply*

First, the defendants agree that Shannon must establish the three requirements in *Mettler* in order to enable a jury to find the existence of a municipal custom. However, the defendants allege that Shannon supports his argument, that the three requirements are met, with unsupported opinions and misstatements of the record. Specifically, the defendants claim that Stine's analysis misstates certain elements of the investigations, omits investigatory steps that were undertaken, and asserts broad pronouncements of how the Professional Standards lieutenant should have handled the investigations without providing a basis for the assertion.

The defendants claim that Shannon has not shown, through the investigations he cited, a "pattern of acquiescence in the face of constitutional violations." Docket no. 46-2 (citing *Rogers v. City of Little Rock, Ark.*, 152 F.3d 790, 799 (8th Cir. 1998). Rather, the defendants claim that the investigations into police misconduct conformed with the standard

protocol outlined in the Department's Investigation of Complaints of Misconduct Policy and that the policy is based on several CALEA standards.

The defendants also reject Shannon's argument based on the probabilities of getting a sustained excessive force complaint. The defendants claim that even the Bureau of Justice Statistics Report, which Huang relies upon, states that "complaint volumes, rates, and dispositions varied by agency characteristics, such as the size and type of agency, as well as policies and procedures related to the handling of complaints." *Id.* (quoting Plaintiff's App. at 137).

Lastly, the defendants attack Shannon's claim that Koehler's previous investigations for excessive force are a basis to show the custom was a moving force behind his alleged violation of Shannon's constitutional rights. According to the defendants, Shannon has not produced any evidence that the investigations into these complaints were inadequate. In addition, the defendants claim that the "mere existence of previous citizens' complaints does not suffice to show a municipal custom of permitting or encouraging excessive force." *Id.* (citing *Rogers*, 152 F.3d at 790).

### d.    Oral arguments

At oral arguments, the defendants' counsel claimed that the excessive force complaints relative to the number of arrests by the SCPD is very low. Between 2004 and 2008, counsel alleges that there were 30,000 arrests but only 25 excessive force complaints. Counsel argues that, as a result, there is insufficient evidence to establish a pattern or practice of unconstitutional conduct as a matter of law.

Shannon's counsel claimed that there were 42 complaints during a seven year period alleging that Sioux City Police Officers had used excessive force. Counsel alleged that the facts of some of the complaints were similar to the facts of the case currently before this court. Counsel argued that one of his alleged experts, Stine, explained the flawed

methodology used by the SCPD in investigating the complaints.  Counsel also referred to another alleged expert, Huang, who found that zero percent of sustained complaints is inconsistent with the expected percentage.  Counsel also alleged that Chief Frisbie was responsible for making these determinations and, therefore, his decisions are imputed to the City.  According to counsel, Chief Frisbie's faulty methods of investigation showed deliberate indifference.  In addition, the fact that Koehler had been investigated six times shows that he knew of the faulty methods of investigation employed by the City and Chief Frisbie.  Similarly, counsel claimed that Koehler knew that the City and Chief Frisbie went out of their way not to find excessive force, when evaluating citizen complaints.

### 2. *Analysis*

"To establish municipal liability under § 1983, a plaintiff must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity." *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009) (citing *Monell*, 436 U.S. at 690-92, 98 S.Ct. 2018, 56 L.Ed.2d 611).  As the parties have both recognized, to show the existence of a custom, a plaintiff must prove:

> (1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
> (2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
> (3) The plaintiff's injury by acts pursuant to the governmental entity's custom, i.e., proof that the custom was the moving force behind the constitutional violation.

*Mettler*, 165 F.3d at 1204 (citing *Ware v. Jackson County*, 150 F.3d 873, 880, in turn quoting *Jane Doe A*, 901 F.2d at 646)).

### a. *Pattern of unconstitutional misconduct*

Shannon claims that the City and Chief Frisbie ignored SCPD officers' use of excessive force to such an extent that it amounts to "a continuing, widespread, persistent pattern of unconstitutional misconduct." *Id.* The Eighth Circuit Court of Appeals has:

> . . . held municipalities liable under *Monell* when the plaintiffs have produced evidence of prior complaints sufficient to demonstrate that the municipalities and their officials ignored police misconduct. *See, e.g., Parrish v. Luckie*, 963 F.2d 201, 204-05 (8th Cir.1992) (reviewing the "detailed and compelling" evidence the plaintiff presented that the defendant police department avoided, ignored, and covered up complaints of physical and sexual misconduct by officers); *Harris v. City of Pagedale*, 821 F.2d at 501-06 (finding a plaintiff had proven a municipal custom through the presentation of detailed evidence regarding the particular police officer's previous misconduct, and the city's failure to investigate or punish that conduct), cert. denied, 484 U.S. 986, 108 S.Ct. 504, 98 L.Ed.2d 502 (1987).

*Mettler*, 165 F.3d at 1205. However, "there must also be some showing that the complaints had merit. . . ." *Rogers*, 152 F.3d at 799 (citing *Handle v. City of Little Rock*, 772 F.Supp. 434, 437 (E.D.Ark.1991) (quoting *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir.1987)); *see Mettler*, 165 F.3d at 1205 ("the mere existence of previous citizens' complaints does not suffice to show a municipal custom of permitting or encouraging excessive force.") (citing *Rogers*, 152 F.3d at 799). "Evidence that a police department has failed to investigate previous incidents similar to the incident in question may support a finding that a municipal custom exists, and that such a custom encourages or allows officers to use excessive force without concern for punishment." *Mettler*, 165 F.3d at 1205 (citing *Vann v. City of New York*, 72 F.3d 1040, 1050 (2d Cir.1995); *Fiacco v. City*

*of Rensselaer*, 783 F.2d 319, 329-31 (2d Cir.1986), cert. denied, 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987)).

In this case, it is undisputed that there were 42 complaints of excessive force submitted against Sioux City police officers between 2001 and 2008. These 42 complaints, alone, do "not suffice to show a municipal custom of permitting or encouraging excessive force," *Mettler*, 165 F.3d at 1205, and Shannon does not allege that the quantity of complaints is out of line with the national average. *See* docket no. 40 ("Under this national standard, 4.17 excessive force complaints per year would be expected for the SCPD and there are on average 4.17 excessive force complaints per year from 2001 to 2008. [Shannon's expert] concluded that, at the intake point, the excessive force complaint process is adequate."). Instead, Shannon claims that many of the 42 excessive force complaints had merit, and he argues that the meritorious complaints, and the City's and Chief Frisbie's failure to properly investigate the complaints or discipline officers in response to the complaints, amounts to a pattern or series of unconstitutional acts that evidences a municipal custom.

Shannon claims that, even though none of the 42 complaints was sustained on the grounds that excessive force was found to have been used, over fifteen[19] of the 42 complaints were wrongly decided. Stine, one of Shannon's experts, opines as to the

---

[19] Shannon claims that examples of wrongly decided complaints include the following: 01-50785 (Plaintiff's App. at 322); 01-38648 (Plaintiff's App. at 295); 01-23987 (Plaintiff's App. at 238); unnumbered complaint at (Plaintiff's App. at 219); 02-14529 (Plaintiff's App. at 336); 02-10428 (Plaintiff's App. at 384); 02-7082 (Plaintiff's App. at 426); 03-30398 (Plaintiff's App. at 590); K3-04-0042 (Plaintiff's App. at 828); 05-1609 (Plaintiff's App. at 1058); 05-46315 (Plaintiff's App. at 1046); 05-36081 (Plaintiff's App. at 1017); 05-31226 (Plaintiff's App. at 932); 07-32382 (Plaintiff's App. at 1227); and unnumbered complaint at (Plaintiff's App. at 189). *See* docket no. 40.

various reasons why the reports were wrongly decided—he identifies allegedly disturbing trends in the way the investigations were conducted, which include failures to: conduct a canvas of the location of the incident to seek out witnesses; interview witnesses that were identifiable and available; resolve factual conflicts within the reports; follow up on discrepancies; to hold the SCPD accountable for improper practices[20]; and allow officers under investigation to answer questions without coaching them regarding the proper answers.

Shannon identifies and analyzes several complaint files in his effort to "produce[] evidence of prior complaints sufficient to demonstrate that the municipalities and their officials ignored police misconduct." *Mettler*, 165 F.3d at 1205. For example, Shannon identifies complaint 05-5832, where the complainant alleged that officers used excessive force when arresting him. *See* Plaintiff's App. at 1090. According to the complainant, he suffered abrasions on his face and left anterior chest pain and tenderness after being wrestled to the ground by two police officers. *Id.* at 1095. The complainant had been at Teaser's Gentlemen's Club, and a Teaser's employee reported him to law enforcement officers after he allegedly told people in the club that he was an undercover police officer. *Id.* at 1097. According to the SCPD's Offense Report, two officers were dispatched to Teaser's to investigate the allegation, made contact with the complainant, and had him follow the officers outside the club. Once outside, the officers asked the complainant for

---

[20]    Shannon claims that the SCPD's investigations ignore improper practices, and illegal practices, by officers on many occasions. *See* docket no. 40 (citing complaint incident numbers 01-23987 (Plaintiff's App. at 238-268); 03-30398 (Plaintiff's App. 590-645); 04-29750 (Plaintiff's App. 774-827); 05-13470 (Plaintiff's App. 1133-1171); 05-1609 (Plaintiff's App. 1058-1089); 04-5446 (Plaintiff's App. 710-29); and the complaint at Plaintiff's App. at 189 without an incident number (Plaintiff's App. at 189-218)).

identification.  The complainant provided Iowa identification, but one of the officers asked

for additional forms of identification.  The report then states:

> [At t]his time [the complainant] kind of became cocky and condescending.  He handed me a DNR hunter safety card.  He handed me a blood donor card and one other small piece of paper with his name on it.  What I was looking for was any identification to show that this individual was a law enforcement officer, a police I.D., a police badge or anything like that.  However, [the complainant] was unable to show anything such as that.
>
> [The complainant] at that time pointed a finger at [one officer] and told him that there wasn't anything funny.  [The officer] and myself were not laughing at [the complainant] but he apparently thought or assumed that somebody was laughing at him.  He pointed a finger at [the officer].  Told him that he better not laugh at him or he would sue him at which point [the officer] asked him to not stick a finger at him.  [The complainant's] reply was like what are you going to do or something like that, and [the officer] stated that he would arrest him.  [The complainant] said something to the effect of no, you're not and no, you can't.
>
> At that time myself and [the officer] both made the decision at the same time that [the complainant] was indeed going to be arrested both for False Impersonation of a Public Official and for the Public Intox.  We did go to put handcuffs on him.  At that time [the complainant] tensed up and started to resist not so much in a physical manner towards [the officer] and myself but more in a noncompliant resistance.
>
> At that time I did step on his right foot, tried to sweep his right foot and we brought [the complainant] to the ground.  At that time with the assistance of [the other officer], we did have a very, very brief struggle with [the complainant] to get his

> hands behind his back and he was placed into handcuffs. He
> was then picked up off the ground by [an officer] and myself.

*Id.* at 1101-02.

Despite the Offense Report's statement that the complainant "started to resist not so much in a physical manner towards [the officer] and myself but in a noncompliant resistance," the investigating officer found the "subject was physically resistant and did not submit to being arrested." *Id.* at 1099. As a result, the investigating officer concluded that he did not see a violation of the SCPD's policy on Use of Force. Chief Frisbie informed the officers: "I find no indication of inappropriate conduct on your part during this incident. As a result of the investigation, I show no wrongdoing in reference to this complaint. This complaint is closed and ruled as 'not sustained[21].'" *Id.* at 1091. Shannon claims that, as in his case, the complainant in incident 05-5832 had a leg sweep performed on him, was thrown to the ground, and suffered similar injuries. Viewing the record in the light most favorable to Shannon, the court finds that Shannon has made a sufficient showing that complaint 05-5832 had merit. *See Rogers,* 152 F.3d at 799 ("there must also be some showing that the complaints had merit. . . ."). This police report admits that the officers performed a leg sweep on the complainant after the complainant "tensed up and started to resist not so much in a physical manner . . . but more in a noncompliant resistance." The complaintant—though being accused of committing a

---

[21] As stated above, the disposition of complaints will be one of the following under the SCPD's Citizen Complaint Procedure: (1) Unfounded, (2) Exonerated, (3) Not Sustained, or (4) Sustained. *See* Plaintiff's App. at 187. Unfounded means the "incident did not occur or officers [were] not involved." *Id.* Exonerated means the "incident occurred but [the] officer acted lawfully and properly. *Id.* Not Sustained means there was "[i]nsufficient evidence to prove or disprove the allegation. *Id.* Sustained means that the "allegation is supported by sufficient evidence." *Id.*

serious offense of impersonating a police officer—had not allegedly committed a severe crime, and there is no evidence that "the suspect pose[d] an immediate threat to the safety of the officers or others . . . [or that he] actively resist[ed] arrest or attempt[ed] to evade arrest by flight.'" *Howard*, 570 F.3d at 989 (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865). The complainant also complained of more than *de minimus* injuries, *see Mann*, 497 F.3d at 826 (citations omitted) (considering the extent of the suspects injuries as a relevant consideration) and the situation did not appear to be "tense, uncertain, and rapidly evolving." *Brown*, 574 F.3d at 497 (citing *Graham*, 490 U.S. at 397, 109 S.Ct. 1865).

Complaint 05-36081 is another alleged example of excessive force, used by a SCPD officer. The complainant alleged that officers used excessive force on him after being arrested. *See* Plaintiff's App. at 1017. According to the complainant, he was arrested, was handcuffed too tightly, was slammed into the walls at the jail, thrown on the jail floor, tasered, and subsequently threatened with a taser. The investigating lieutenant and the officer under investigation had the following discussion, in conjunction with the investigation of this complaint:

Investigator: OK, so now you have three jailers in all?

Officer:     There's three down there. . . .

Investigator: OK.

Officer:     So they get [the complainant], and they're pushing him up against the door to go into the next room, to the elevator, and he's pushing against them, fighting against them, and they push him against the wall—the next wall in—and kind of slide him around to the elevator and he's still pushing. At that time, I take my taser out, take the cartridge off, put it in his back and give him a dry stun.

Investigator: OK.

Officer:     He slides down in front of the elevator—cuz the doors haven't opened yet.

Investigator: OK, so you're outside the elevator doors?

Officer:     Yep, we're outside the elevator doors.

Investigator: OK.

Officer:     He slides down, I back off, the door opens, and [a jailer] pulls him inside the elevator.

Investigator: What's he doing that you dry stun him?

Officer:     He's fighting against the jailers—he's pushing back against them, you know, he's trying to—I don't know if he's trying to break free but he's, he's giving them a whole lot of resistance.

Investigator: Uh uh.

Officer:     And, so I give him the dry stun.

Investigator: He was handcuffed right?

Officer:     Yeah, he was handcuffed.

 . . .

Investigator: He rode in the elevator on the floor[?]

Officer:     Yeah, he rode—then he gets up, I'm already out of the elevator and I say hey, just come in here.  And he's starting to yell at [an unidentified individual] for tasing him and I say hey, I'm the one who tased you.  And he's starting to get mouthy again and starting to tense up and be, uh, gesturing towards me—so I did, I took my taser and I stuck it right in his chest and said hey, you're gonna get it again if you don't calm down.  Do you understand?  And I said it twice, do you understand?  And he said yeah, I understand.  So I backed off, we got him around,

I took the cuffs off him, finished processing him through the—he did the OWI test for me. . . .

. . .

Investigator:  When you stunned him, was he kicking people or was he just pushing?

Officer:       He was, he wasn't kicking—he was just pushing away and fighting against the Correctional officers. . . .

Investigator:  You feel as though he was getting the best of [the jailers]?  That, that there was no other method of controlling him with you and three jailers that you had to tase this guy?

Officer:       Well I just, that probably was the least amount of force that could have been used without having to actually go hands-on with the guy and knee strikes and stuff, I thought it'd be easier to do—dry stun him than have to go hands-on with him, strike this guy with using hands.

*Id.* at 1037-39.  On September 14, 2005, a SCPD lieutenant wrote a memorandum to a SCPD captain, stating that the officer's use of a taser to "dry stun" a prisoner for lack of cooperation, rather than physical resistance, when the subject was already in custody and handcuffed, was prohibited by policy in Section 4.01.06[22] of the Policy Manual and

_____

[22]    According to the letter, Section 4.01.06 "speaks to the use of an authorized stunning device, which the Taser is, for 'the purpose of overcoming the resistance of a violent or combative person to be taken into custody.  The use of these implements by officers is permissible only to defend themselves or to overcome the physical resistance of the person to be taken into custody when lower levels of force have not been effective and higher levels would be inappropriate.'  The same section goes on to state that these devices shall 'never be used as a prod or come along.'"  Plaintiff's App. at 18.

General Order 2005-1[23], governing the use of electronic stunning devices and the General Order governing the taser. *See id.* at 18-19. Despite the investigation and September 14, 2005, letter, on October 18, 2005, Chief Frisbie informs the complainant that:

> I have reviewed the information provided by you to [the investigating officer] and also the officer's and jailers' reports. In light of the circumstances, the officer handled the situation appropriately and did not violate any departmental policy. There is no indication the officer used excessive force to control your resistance. Therefore, I am ruling this complaint as "Not Sustained."

Plaintiff's App. at 1044. Chief Frisbie also sent a memorandum to the officer under investigation, which stated, in part:

> I am in receipt of [the investigating officer's] investigation report. . . . I find no indication of inappropriate conduct on your part during this incident, or any wrongdoing in reference to this complaint. This complaint is closed and ruled as "not sustained."

Plaintiff's App. at 1019.

The officer under investigation was neither disciplined for violating police policy nor for otherwise using excessive force. Again, the relevant circumstances do not support Chief Frisbie's ultimate finding that the complaint should be "not sustained," but instead support a finding that the officer used excessive, and unconstitutional, force.

---

[23] The letter explains that General Order 2005-1 explains that the "'Taser shall be deployed only in circumstances where it is deemed reasonable to control a resistive suspect.' The same order speaks to the use of the Taser when conventional tactics have not been, or likely will not be, effective." Plaintiff's App. at 18.

Shannon also claims that complaint 03-49583 is similarly problematic. The complainant alleged that officers used excessive force on her husband, while he was in custody for alleged domestic abuse. *See* Plaintiff's App. at 649. The complainant's husband had allegedly become intoxicated and thrown a knife at his stepdaughter. *Id.* When officers arrived on the scene, the complainant's husband was in the basement alone. Officers made contact with him, searched him, and forcefully put his hands behind his back. *Id.* at 653-53. The police Offense Report states:

> We had to forcefully put his hands behind his back [due to] the fact that there was possibly a knife around him. That's the reason he was handcuffed right away. He was being led up the stairs when he became resistive. He started kicking at [two officers]. He kicked backward toward [an officer], who was transporting him up the stairs. [The officer] bumped his head as he was going up the stairs on the low-hanging ceiling. He was kicked several times in the legs and [the other officer] was kicked also.
>
> When they got to the top of the stairs, I was still down in the stairwell. I knew the individual had kicked [one officer] because [he] said, "Quit kicking me." [The officer] shoved him away because he was kicked in the groin area. When he was shoved away, [the complainant's husband's] head hit the refrigerator and he suffered a laceration from the refrigerator.

*Id.* at 653. The officer who pushed the complainant's husband stated in the report:

> As [another officer] got to the top of the stairs, I reached out to take control of [the complainant's husband] and at this point he kicked with his right leg and his foot did strike me in the right thigh and groin area.
>
> At this point I immediately did feel a sharp pain and immediately pushed [the complainant's husband] away from

me. He did go a distance of maybe two to three feet, losing his balance and struck his head on the front of a refrigerator.

*Id.* at 660. The investigating officer found that:

> [The officer's] actions constituted shoving [the complainant's husband] away from him which resulted in his striking his head. [The officer] did not ram his head into the refrigerator. He struck it after being shoved away. This matter was investigated pursuant to the policy involving the use of force and was found to be appropriate to the circumstances. This complaint is unfounded.

*Id.* at 651. Chief Frisbie informed the complainant that:

> Officers encountered [your husband] being physically combative and out of control. While [he] was handcuffed he continued to resist officers' attempts to control him. [Your husband] kicked [an officer] who then pushed [your husband] away from him. [The officer's] response to being assaulted was not excessive. Your complaint of excessive use of force is therefore ruled as unfounded and the officer has been exonerated.

*Id.* at 648.

Shannon argues that this complaint had merit because the complainant's husband was in custody and handcuffed. Although the defendant was allegedly kicking the officers in this case, the record fails to explain why three police officers, when faced with a kicking defendant, needed to push him toward a refrigerator—even if they did not ram his head into the refrigerator, as they alleged. Considering the complainant's husband was in custody, handcuffed, being escorted by three officers, and suffered a severe cut to his head, the court finds that Shannon has, again, generated a genuine issue of material fact concerning whether an instance of excessive force was ignored. In addition, the court

notes that the finding that the complaint was "unfounded," which means that "[t]he incident did not occur or officers [were] not involved," *see* Plaintiff's App. at 187, is inconsistent with the record.

Shannon also asserts a complaint without an incident number, at Plaintiff's App. at 189, involved the use of excessive force that was subsequently ignored by Chief Frisbie and the City. In this complaint, the complainant alleged that officers used excessive force by temporarily arresting him. *See* Plaintiff's App. at 189. The complainant alleges:

> I was at Burger Time across the street from McDonald's[.] Police car 180 is at 8th and Hamilton crossing Hamilton. He turned his lights on to cross the street, turned them off right as he got across the intersection. He pulled into McDonald's to eat with his friends. I go over to the restaurant to ask him why he did that to say that I was going to report him for what he did. He said go ahead and get out of here. His buddies started to say comments to him like, are you going to take that, better get him, etc. . . . I walked out. I told him and his buddies to fuck off and told the officer to go to hell and that he was worthless. I walked out and as I walked out he followed and put me under arrest while his one friend cheered him on. He put me in the back of his car and went back inside to finish eating. He came back out and released me and told me to never talk to him like that again. From this I received a sore wrist and a bump on my wrist from the handcuffs.

Plaintiff's App. at 191-92. In the SCPD Offense Report, the arresting officer explained that he had witnessed a red light violation and turned on his overhead lights but was unable to get out of the traffic to pursue the vehicle immediately. Plaintiff's App. at 201. The report then states:

> I looked south to see the vehicle. It was [now] approaching West 4th and Hamilton, and I knew at that time I wouldn't be able to stop the vehicle. At that time I turned my overhead

> lights off, crossed the intersection, and pulled into McDonald's
> because they had 39 cent cheeseburgers on sale.

*Id.* at 201. The officer then explains that he saw some friends, who also work in law enforcement, and stood in line near them. The officer claims that the complainant entered the restaurant and questioned him about his decision to turn on his overhead lights to cross through a red light in order to get to McDonald's. *Id.* The officer allegedly explained his reasoning—that he witnessed a vehicle who had run a red light but changed his mind. The report then states:

> [The complainant] then started yelling profanity saying "you fucking cops are all alike; you think you got all the fuckin' power; you fucking cops" as he was walking. I advised him to leave McDonald's. At that time as he was leaving as he got to the door he kept yelling "you fuckin' cops; you fuckin' pigs; you're all fucking alike" and kept yelling profanities.
>
> At that time as he was out the door. . . . heading westbound I then went out the door along with [one of the friends in law enforcement] and asked him what his problem was; he doesn't have to yell in a public area that way. I then advised him to put his hands on my car. I handcuffed him, placed him in my car, and detained him for safekeeping. He became loud. I didn't know what to expect out of this subject simply because he was irate and out of control.
>
> I then went over to [two friends who are in law enforcement] and advised them I couldn't believe this guy was doing this, and that I thought I'd leave him in there for a few minutes, detain him, for his own safety and for anybody else who was in the area. Right before I grabbed a hold of him and stopped him at that time he then began crying. When I was putting the cuffs on him, he began crying again stating he was sorry; he was very sorry; he didn't know why he did it; he shouldn't have done it; these things just occur to him like that and that

> happens; and he apologized about 25 times and began crying
> as I put him in the squad car.

*Id.* at 201-02.  The officer explained that he asked the complainant where he was from and

why he was in town.  *Id.* at 202.  The complainant stated that he was visiting his parents

in Leeds and that all he wanted to do was get out of town and return to his home in

Colorado.  *Id.*  After additional discussion, the officer uncuffed him and told him it would

be a good idea for him to do what he said he was going to do and jump on the interstate

and return to Colorado before there were any more problems.  *Id.*

The officer investigating this complaint stated that the officer's "actions of

handcuffing and making [the complainant] sit in the [police] car for five minutes could be

considered a violation of 6.01.01[24], Arrest Standards, their positions as police officers

give them no right to punish the violator or to meet [sic] out punishment for their

---

[24]  Section 6.01.01 of the SCPD Policy Directive states:  Arrest Standards - Policy
Statement.  The primary responsibility of the SCPD and its individual officers is the
provision of service to the community.  In their role as law enforcement officers, SCPD
Officers have a primary responsibility to know the limitations placed upon their
enforcement powers.  Because they represent the legal will of the community, they must
conform to the limitations and proscriptions which the community, through the law and
departmental policies, have placed upon them.

> Officers of the SCPD shall use their powers of arrest strictly
> in accordance with the law and department policies, and with
> due regard to the rights of citizens concerned.  Their positions
> as police officers give them no right to punish the violator nor
> to mete out punishment for the offense.  Each officer shall be
> mindful of his responsibility to pay strict heed to the selection
> of the means by which he discharges his powers to enforce the
> law.  To this end, members shall cultivate a dedication to the
> service of the community and the equitable upholding of the
> law.

Plaintiff's App. at 197.

offenses." *Id*. at 215. The investigating officer also questioned the officer's decision to release the complainant once he was arrested—the investigating officer noted that the officer under investigation repeatedly stated that he did not arrest the complainant, when he handcuffed him and put him in the backseat of the police car. On July 12, 2001, Chief Frisbie wrote a letter to the complainant stating, in part:

> The information provided by you allowed for a successful conclusion of an Internal Affairs investigation into [the complained of officer's] conduct on April 18, 2001. Some of the allegations made were sustained (upheld) by the investigative process and disciplinary action has taken place.
>
> I appreciate your assistance in this matter. It is only through persons such as you who bring these matters to our attention that enables us to continue to rectify any shortcomings in our service.

*Id*. at 191. In the letter to the complainant, Chief Frisbie did not describe which allegations were sustained or upheld. However, on June 27, 2001, the officer under investigation received an oral reprimand. Plaintiff's App. at 193. The reprimand explained that the officer had probable cause to arrest the complainant and did not question his authority to detain him. Instead, the officer was only reprimanded for releasing the complainant, as it is up to the court to dismiss charges—the author of the reprimand was apparently relying on a February 25, 2000, "Catch and Release" Memorandum, where a member of the City's legal department had advised that officers cannot "unarrest" individuals once they have been arrested. There is no indication that the officer was ever held accountable for his allegedly excessive use of force.

According to the officer under investigation, the complainant had questioned the officer about using his police lights to cross through a red light in order to go to McDonald's, used profanity in response to the officer's statements, and left McDonald's.

Although the officer claims that he detained the complainant for his safety and the safety of others, the most serious crime he allegedly committed was misdemeanor disorderly conduct, there was no indication that the complainant was a danger to himself or others, and he was not evading arrest by leaving the restaurant but, instead, was following the officer's commands. *See Howard*, 570 F.3d at 989 ("Circumstances relevant to the reasonableness of the officer's conduct include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'") (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865). This complaint file, too, supports Shannon's claim that Chief Frisbie ignored police misconduct.

Shannon supports his claim that excessive force complaints were ignored by the SCPD with many additional complaint investigation files in the record, as summarized in the following table:

| Number | Summary of Complaint File | P's Cite |
|---|---|---|
| 01-23987 | An off-duty officer, who had been drinking and was in plain clothes, approached a reckless driving suspect, and shoved him back into his vehicle. Chief Frisbie exonerated the officer under investigation of any wrongdoing. | 238-268 |
| 01-50785 | Officer performs takedown on intoxicated complainant after he allegedly said something about the officer's mother and made other noise. The complainant may have resisted by allegedly "push[ing] off" once the officers grabbed him, but the officers then gave complainant a "big bear hug and started to bring him down." Plaintiff's App. at 332. The complainant sustained facial injuries. Chief Frisbie exonerated the officers under investigation and blamed the complainant for escalating the situation by failing to comply with the officers' requests. *See* Plaintiff's App. at 324. | 322-335 |

| 01-38648 | The complainant claimed that her son had been kicked, hit in the face, and swore at by an officer.  The investigating lieutenant found that the officer under investigation had "used force more readily than is needed.  It is my opinion that [the officer] should be sent for counseling for anger management and assaultive behavior, which is often displayed in his language to citizens, excessive use of force, and excessive use of the K-9."  Plaintiff's App. at 320.  Chief Frisbie ordered an assessment to be done on the officer, and told the complainant that some of the allegations made were sustained, but the record does not clearly illustrate what, if any, disciplinary action was actually taken. | 295-321 |
| (no incident number provided) | Complainant alleges that two off-duty police officers used force on him and provided the name of one of the officers in his complaint.  The investigating lieutenant found that the named officer did not touch the complainant, based on several witnesses' testimony, but found that the other alleged officer did push the complainant.  Chief Frisbie informed the complainant that the officer he identified was not the person that touched him and found the complaint unfounded.  The record does not clarify, however, whether the second individual, who admitted to using force on the complainant and was alleged to be a police officer, was actually a police officer.  If he was, the investigation appeared to result in an unfounded disposition simply because the complainant failed to identify the second officer by name—the investigating lieutenant knew the name of the individual who used the force. | 219-237 |

02-14529    The complainant alleges that an officer pulled him to the ground,        336-
            kneed him in the stomach, and that a second officer put him in a          383
            choke hold while handcuffing him.  Once the complainant was
            handcuffed, he was allegedly pulled up by his hair and hit three or
            four times in the head.  The officers claim that they grabbed the
            complainant's hand as he turned to walk away and that he resisted
            and, as a result, they "took ahold of his right arm and the back of
            his head and we took him to the ground."  Plaintiff's App. at 358.
            The complainant had allegedly broken a window out of his ex-
            girlfriend's car but did not appear to be a threat to the officers and
            suffered injuries as a result of the officer's alleged use of excessive
            force.  One of the complainant's witnesses corroborates the
            complainant's claims in claiming officers beat him, kneed him in
            the gut on the way to the ground, and picked him straight up by
            the handcuffs.  The complainant's second witness also stated that
            the complainant "turned around and three officers grabbed
            him—one of them kneed him in the stomach—one of them put him
            in a choke hold and pulled him down [to] the floor."  Plaintiff's
            App. at 373.  One of the officers under investigation explained
            that, on the way to the police car, "yeah, I did have a hold of his
            ponytail—the reason being he was pushing at me and he stunk
            really bad.  I did not want him to have a chance to spit on me.
            When he started to push at me again, I dropped him to the ground
            and said [to the complainant], it's done, its over, you're under
            arrest, knock it off."  Plaintiff's App. at 382.  Chief Frisbie
            informed the complainant that the complaint was "not sustained"
            because, "[w]hen the officers questioned you about criminal
            mischief to your ex-girlfriend's car, you turned and started to
            leave.  The officers believed that they had probable cause to
            arrest.  They grabbed you at that time and you pulled away; they
            then pulled you to the ground.  From that point, the statements
            made by all sides do not coincide with one another.  The facts and
            circumstances surrounding the allegations cannot be determined
            with certainty in light of the evidence presented."  Plaintiff's App.
            at 338.  The officers were informed that the complaint was "not
            sustained."  Plaintiff's App. a 339.

02-10428    Although the complainant's boyfriend was kicking officers while     384-
            in custody, officers admit to kicking him and hitting him—"In any    425
            event, I told the [complainant] in front of [a Sergeant] that yes, I
            did kick him and I did hit him.  I also told her that her husband
            had kicked officers as well."  Plaintiff's App. at 416.  The
            complainant's claim, that officers used excessive force on her
            boyfriend, was ruled "unfounded," which means that the
            "[i]ncident did not occur or officers [were] not involved."
            Plaintiff's App. at 187.  Chief Frisbie explained, in his letter to the
            complainant, that the complainant's boyfriend "brought on the
            problems when he attempted to kick out the window of the squad
            car after he was placed in the back seat.  Officers were following
            Department policy in the way they attempted to control [the
            boyfriend] until the transport van arrived to take him to jail."

03-30398    The complainant claims that officers used excessive force in         590-
            releasing a police dog at a party with children present, in breaking  645
            a door down, and in drawing their weapons in response to a
            disorderly house call.  The officers claimed that the situation was
            getting out of control and that adults took children inside and
            would not come back out, requiring the officers to break down the
            door—some parents on the outside of the house were allegedly
            concerned about the people inside the house with their children.
            The complainant was informed that her complaint was
            "unsubstantiated," which is not one of the four possible
            dispositions:  Unfounded; Exonerated; Not Sustained; and
            Sustained.

| 05-13470 | The complainant claims an officer used excessive force in arresting her son at school, and was inappropriate in stating that he would be "somebody's bitch" at juvenile detention. The officer admitted to using his legal authority at school, in arresting a student, in conflict with a legal opinion from City Legal. He also admitted to making the alleged comment. Chief Frisbie sustained the complaint as to the inappropriate comment and gave him an oral reprimand. Plaintiff's App. at 1135. Chief Frisbie did not reprimand the officer for his use of force or for arresting the student at school, even though it was admittedly in violation of the legal opinion from City Legal. | 113 3 - 117 1 |
|---|---|---|
| 05-46315 | The complainant states that the officer assaulted him after his companion said "what a mother fucking deal" under his breath, while walking away from an officer who had just determined the complainant was not operating his vehicle while intoxicated. The officer claims that the complainant's companion stated, "you mother fucker" to the officer, and decided to arrest him for public intoxication. The officer under investigation does not mention any use of force against the complainant in his report, but another officer states that the complainant "tried to get in between [the officer under investigation] and the individual [who made the alleged statements]. [The complainant] was moved aside and we placed [the individual who made the comment] in handcuffs." Plaintiff's App. at 1057. Without evidence of a further investigation, the Command Officer Investigating appears to have "contacted [the complainant] and informed him that based on the circumstances that the complaint is not sustained." Plaintiff's App. at 1047. | 104 6 - 105 7 |

05-31226    The complainant claims that an arresting officer used excessive    932-
force in kicking him in the legs, torso, and chin in bringing him to    953
the ground. The officer claims that the force was used when the
complainant failed to follow the officer's command to get on the
ground. According to the officer, two kicks to the complainant's
legs were used to get him to the ground, and he subsequently put
"his foot across [the complainant's neck and shoulder
area—possibly the upper portion of his shoe would have been on
his cheek—but he did that in an attempt to keep [the complainant]
on the ground as [another officer] was putting the cuffs on him."
Plaintiff's App. at 946. The same officer explained to the
investigating officer that "in some way he felt he was being kinder
to [the complainant] by kicking him twice in the leg, trying to get
him to comply, rather than shoot him with the Taser. He felt that
was less harmful to him, but when that didn't work, they were
able to tackle him to the ground." The second officer on the scene
claims that the other officer did not kick the complainant and
admits that he had left out a push, that he applied to bring the
complainant down, from his dictation. The investigating officer
claimed that the complainant's lack of visible injuries were in
conflict with his claims that he had been kicked, but recognizes
that the complainant suffered an abrasion on his chin. Chief
Frisbie informed the complainant that officers used only the force
necessary to sustain his arrest and "found no evidence of any
injuries to you when [the complainant was interviewed] a day and
a half after the alleged assault." Plaintiff's App. at 934. Chief
Frisbie found that the allegation was, therefore, unfounded. *Id.*

The court finds that Shannon has generated a genuine issue of material fact as to
"[t]he existence of a continuing, widespread, persistent pattern of unconstitutional
misconduct by the governmental entity's employees." *Mettler*, 165 F.3d at 1204. Viewing
the record in the light most favorable to Shannon, Shannon has identified evidence of prior
complaints that the City and Chief Frisbie ignored police misconduct—they specifically

ignored the use of excessive force.  *See id*, 165 F.3d at 1205 (The court explained that it has held municipalities liable under *Monell* "when the plaintiffs have produced evidence of prior complaints sufficient to demonstrate that the municipalities and their officials ignored police misconduct.") (citations omitted).   In addition, Shannon has provided evidence that many of the complaints had merit.  *See Rogers*, 152 F.3d at 799 ("there must be some showing that the complaints had merit. . .").

### b. *Deliberate indifference or tacit authorization*

Second, Shannon must show "[d]eliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct." *Mettler*, 165 F.3d at 1204.  Chief Frisbie, as Police Chief, decides the final disposition of complaints under the SCPD's Citizen Complaint Procedure.  In addition, the court noted in its above review of the allegedly meritorious complaints at issue, that Chief Frisbie—in deciding the final disposition of the case—decided not to discipline officers on multiple occasions when—viewing the record in the light most favorable to Shannon—discipline, or at least further investigation, appeared warranted.  As a result, the court finds that Shannon has met his burden of producing a genuine issue of material fact concerning whether Chief Frisbie, and the City, showed deliberate indifference or tacit authorization to the excessive force used by SCPD officers, after Chief Frisbie was clearly put on notice of the complaints due to his role in the complaint procedure.  *See Harris*, 821 F.2d at  504 (In order to show deliberate indifference or tacit authorization, the plaintiff "had to show that City officials had notice of prior incidents of police misconduct and had deliberately failed to act on this knowledge.")

### c. *Causation*

Lastly, Shannon must show "injury by acts pursuant to the governmental entity's custom, i.e., proof that the custom was the moving force behind the constitutional

violation." *Mettler*, 165 F.3d at 1204 (citations omitted). Municipal liability under § 1983 cannot be premised on the mere fact that the unconstitutional act resulted from a municipal custom in a "but for" sense; it must be shown that the act was taken "pursuant to" the custom, i.e., that the municipal custom was "the moving force of the constitutional violation." *Harris*, 821 F.2d at 507 (citing *Pembaur*, 106 S.Ct. at 1299-1300 n. 11 (plurality opinion) (citation omitted); *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037). The Eighth Circuit Court of Appeals has recognized causation based on a failure to correct recognized misconduct. *See Ware*, 150 F.3d at 885 ("In *Harris v. City of Pagedale*, we held that, where it becomes clear that an employee or group of employees needs close and continuing supervision and "the municipality fails to provide such supervision, the inevitable result is a continuation of the misconduct.") (citing *Harris*, 821 F.2d at 508).

The court finds that Shannon has generated a genuine issue of material fact concerning whether the custom of allowing SCPD officers to use excessive force, without consequences, caused Koehler's alleged use of excessive force against Shannon. As discussed above, Chief Frisbie—a policy maker for the City[25]—was put on notice that officers were using excessive force. Rather than disciplining officers upon receiving complaints of the excessive force, Chief Frisbie informed the officers, repeatedly, that the complainant's accusations would not be sustained. Rather, Chief Frisbie would inform the officers that the complaints were unfounded, that the officer was exonerated, or that the allegations were not sustained. In addition, Chief Frisbie failed to sustain even one complaint of excessive force between 2001 and 2008. Although the failure to sustain any

---

[25] It is undisputed that, as Chief of Police, Chief Frisbie is: (1) "under the general direction of the City Manager, and with the City Manager, formulates policies and regulations governing the Police Department," and (2) "is [ultimately] responsible for disciplining the Police personnel." *See* docket no. 47.

complaints during this time frame might mean that there were no violations, which Chief Frisbie could not be faulted for, the court has determined that there is sufficient evidence in the record that many of the complaints should have been sustained.

Because Shannon has generated a genuine issue of material fact concerning whether Koehler's alleged use of excessive force was committed pursuant to a municipal custom under § 1983, *see Moyle*, 571 F.3d at 817 (citing *Monell*, 436 U.S. at 690-92, 98 S.Ct. 2018, 56 L.Ed.2d 611), the court will not grant the defendants' motion for summary judgment on the claim that the City and Chief Frisbie are not liable under § 1983 and *Monell*.

### E. Assault and Battery

#### 1. Arguments of the parties

##### a. The defendants' initial arguments

The defendants claim that Koehler is also protected by qualified immunity from the State assault and battery charges. According to the defendants, Koehler was effectuating a lawful arrest for assault on a police officer, after Shannon had assaulted him at least twice. In addition, the defendants argue that Shannon put Koehler in apprehension of being assaulted further. As a result, defendants allege that the battery Koehler committed was reasonable under the circumstances and permissive under Iowa law. Docket no. 31-7 (citing IOWA CODE § 804.8[26]).

---

[26] Iowa Code § 804.8 states, in pertinent part: "A peace officer, while making a lawful arrest, is justified in the use of any force which the peace officer reasonably believes to be necessary to effect the arrest or to defend any person from bodily harm while making the arrest." IOWA CODE § 804.8 (2008).

The defendants also claim that the City and Chief Frisbie are not liable for Iowa state law claims under a *respondeat superior* theory. According to the defendants, Iowa Code § 670.4 lists numerous exceptions to Iowa's Municipal Tort Claims Act, which Iowa courts have broadly interpreted. The defendants appear to allege that Koehler exercised due care at the time of the arrest and, therefore, the City and Chief Frisbie are entitled to statutory immunity with respect to the state tort claim.

### b.    *Shannon's arguments in response*

Shannon claims that the issue of whether Koehler used more force than was apparently necessary is a jury question under Iowa law. *See* docket no. 40 (citing *Lawyer v. Stansell*, 217 Iowa 111, 250 N.W. 887, 890 (1933)). Shannon argues that it is an open question concerning whether a reasonable officer, faced with the facts and circumstances that existed on September 13, 2006, would or would not have used force, or the degree of force Koehler used. Shannon, therefore, claims that Koehler is not protected from liability under § 804.8.

Shannon also disputes the defendants' claim that the City and Chief Frisbie are entitled to statutory immunity under § 670.4. Shannon claims that Koehler did not exercise due care, as he did not properly exercise police authority—Shannon claims that Koehler's arrest was accomplished with force that was unreasonable, excessive, and inappropriate.

### c.    *The defendants' reply*

The defendants did not discuss these claims in its reply brief. *See* docket no. 46-2.

### d.    *Oral arguments*

The parties did not provide additional oral arguments concerning these claims.

### 2.    *Analysis*

The defendants claim that Koehler is subject to qualified immunity from the State

assault and battery claims under Iowa Code § 804.8. Section 804.8 states in pertinent part:

> A peace officer, while making a lawful arrest, is justified in the use of any force which the peace officer reasonably believes to be necessary to effect the arrest or to defend any person from bodily harm while making the arrest.

IOWA CODE § 804.8 (2008). The court has found, above, that there are genuine issues of material fact concerning whether Koehler's use of force was reasonable—the court also questions whether there was probable cause for the arrest. For the same reasons, *see Chelf v. Civil Service Com'n of City of Davenport*, 515 N.W.2d 353, 355 (Iowa App. 1994) ("We find the 'reasonableness' inquiry in Iowa Code section 804.8 is an objective standard. We find support for our interpretation in *Graham*, 490 U.S. at 396-97, 109 S.Ct. at 1871-72, 104 L.Ed.2d at 455-56 (1989)."); *Lawyer v. City of Council Bluffs, Iowa*, 240 F.Supp.2d 941, 953 (S.D.Iowa 2002), there are genuine issues of material fact concerning whether Koehler arrested Shannon pursuant to his statutory authority under § 804.8 and, therefore, the court declines to grant the defendants' motion for summary judgment for Shannon's assault and battery claims against Koehler.

The defendants also claim that the City and Chief Frisbie are entitled to statutory immunity to the State assault and battery claims under § 670.4, because Koehler acted with due care. Section 670.4 provides statutory immunity for liability imposed under 670.2[27], for:

> Any claim based upon an act or omission of an officer or employee of the municipality, exercising *due care*, in the execution of a statute, ordinance, or regulation whether the statute, ordinance or regulation is valid, or based upon the

---

[27] Section 670.2 provides for municipal liability for its torts and the torts "of its officers and employees, acting within the scope of their employment or duties. . . ." IOWA CODE § 670.2.

> exercise or performance or the failure to exercise or perform
> a discretionary function or duty on the part of the municipality
> or an officer or employee of the municipality, whether or not
> the discretion is abused.

IOWA CODE § 670.4(3) (2008) (emphasis added). In *Kelley v. Story County Sheriff*, 611 N.W.2d 475 (Iowa 2000), the Iowa Supreme Court found that a county was immune because the sheriff and his officers exercised "due care" under § 670.4(3). *Kelly*, 611 N.W.2d at 484. Even though the officers forcibly entered a residence, the court found that they had statutory authority to do so under Iowa Code § 804.15[28]. The court explained that the officers had exercised due care because they had acted "pursuant to their authority" under Iowa law. *Id.* The court also explained:

> [T]he language "exercising due care" found in section
> 670.4(3) acts as a check on the county's exercise of police
> power to enforce the criminal laws. This is because a
> municipality cannot avail itself of the immunity provisions of
> sections 670.4(3) . . . if the government employees do not
> exercise due care in executing a statute in the first instance.

*Id.*

The court has determined that there are genuine issues of material fact concerning whether Koehler acted pursuant to his statutory authority to arrest Shannon. As a result,

---

[28] Section 804.15 states:

> If a law enforcement officer has reasonable cause to believe
> that a person whom the officer is authorized to arrest is present
> on any private premises, the officer may upon identifying the
> officer as such, demand that the officer be admitted to such
> premises for the purpose of making the arrest. If such demand
> is not promptly complied with, the officer may thereupon enter
> such premises to make the arrest, using such force as is
> reasonably necessary.

IOWA CODE § 804.15 (2008).

the court declines to grant the defendants' motion for summary judgment on Shannon's assault and battery claims against the City and Chief Frisbie under § 670.4(3).

### III. CONCLUSION

THEREFORE, the court finds that Chief United States Magistrate Judge Paul A. Zoss's Order (docket no. 23) is **reversed** to the extent it bifurcates any claims in this case, and trial in this matter is scheduled, on all claims, for January 11, 2010. The defendants' Motion for Summary Judgment and Request for Oral Argument (docket no. 31) is **denied** in its entirety.

**IT IS SO ORDERED.**

**DATED** this 4th day of December, 2009.

_Mark W. Bennett_
MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA