**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

| | |
|---|---|
| TIMOTHY CLAIR SHANNON,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>OFFICER MICHAEL KOEHLER, in his individual and official capacities, CITY OF SIOUX CITY, and JOSEPH C. FRISBIE, in his individual and official capacities,<br><br>　　　　Defendants. | No. C 08-4059-MWB<br><br>**MEMORANDUM OPINION AND ORDER REGARDING PLAINTIFF'S THIRD MOTION IN LIMINE TO PRECLUDE TESTIMONY AND AFFIDAVITS OF CHANCY DEAN**<br><br>**TO BE FILED UNDER SEAL** |

_____

**TABLE OF CONTENTS**

*I. INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
　*A. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
　*B. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*II. ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
　*A. Arguments Of The Parties* . . . . . . . . . . . . . . . . . . . . . . . . . 8
　*B. Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
　　*1. Discovery violation* . . . . . . . . . . . . . . . . . . . . . . . . 10
　　*2. Admissible portions of Chancy Dean's testimony* . . . . . . . . 11
　　*3. Inadmissible portions of Chancy Dean's testimony* . . . 11
　　*4. Questioning Shannon regarding Chancy Dean* . . . . . . . . . . 16

*III. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

# I. INTRODUCTION

Perhaps unsurprisingly, in light of the defendants' indefatigable campaign to vilify Shannon, this case comes before me for another pre-trial ruling on the admissibility of evidence—this time, on Shannon's Third Motion In Limine To Preclude Testimony And Affidavits of Chancy Dean (docket no. 127).

## A. *Factual Background*

I quote from my December 4, 2009, Memorandum Opinion And Order Regarding Defendants' Motion For Summary Judgment, to provide factual background:

> This case arises from an incident that occurred on September 13, 2006, at Tom Foolery's Pub and Grill ("Tom Foolery's") in Sioux City, Iowa. On September 12th, and the early morning of September 13th, Plaintiff Timothy Shannon [("Shannon")] had had several alcoholic drinks and believed himself to be intoxicated to the point where he could and should not drive a vehicle. At approximately 1:16 a.m., on the morning of September 13th, Christina Navrkal [("Navrkal")] and Jill Murad [("Murad")] visited Shannon at Tom Foolery's. . . .
>
> The defendants claim that, once Navrkal and Murad arrived at Tom Foolery's, the two women entered into an altercation with Shannon. In fact, the defendants claim that Shannon punched the left side of Navrkal's face with a close fisted right punch. Navrkal grabbed the side of her face with her hand. Murad then shoved Shannon with both hands causing him to fall backward and onto the floor. After Murad shoved Shannon, she turned around, grabbed her beer, and walked to the front of the bar, near the door, with Navrkal. Navrkal continued to hold her face. Shannon remained on the floor, behind the bar, until a male bartender picked up the liquor bottles that Shannon knocked over in his fall and assisted Shannon to his feet. Murad continued yelling at both the male bartender and Shannon while Navrkal continued to

walk around with her hand to her face. The male bartender left the bar at approximately 1:30 a.m.

At approximately 1:40 a.m., Murad called 911 because she became concerned for Shannon's well-being based on the head injury he received from the fall. Murad advised the dispatcher that Shannon's head was bleeding. This first 911 call ended, and Murad called 911 a second time and stated there had been an argument and to please send an ambulance.

At approximately 1:46 a.m., Sioux City Police officers were dispatched to Tom Foolery's. Two dispatches went out. The first was for a medical call requesting an ambulance. The second advised officers of a disturbance at the bar between two females and that there was an injured person there. [Defendant Michael] Koehler [("Koehler")] volunteered to respond to the scene because he was only about a block away. Koehler was the first officer to arrive at Tom Foolery's. Koehler was met at the door by Murad, who let him into the bar. . . .

It is undisputed that Shannon walked out from behind the bar and toward Koehler. However, the defendants claim that, as Shannon approached Koehler, Shannon swore at him, kicked an overturned bar stool, demanded that Koehler leave the premises, and then aggressively approached Koehler with his right arm extended and with two fingers pointed at Koehler. The parties agree that, while approaching Koehler, Shannon stated something like, "I'm Tim Shannon, I own this bar, get out;" asked Koehler for a warrant; "strongly" told Koehler to leave; and probably used profanity. Shannon further admits that he probably came up to Koehler and told him to "get out . . . I don't need you . . . I don't want you in here . . . I don't need you, get out." The parties agree that Shannon stopped his approach toward Koehler when he was approximately an arm's length away. Although Shannon admits that he approached Koehler, Shannon claims that Koehler had asked him to approach. Shannon also claims that his approach toward Koehler was not aggressive and did not involve him kicking a bar stool. Instead, Shannon claims that he walked toward Koehler with his hands out so that Koehler

3

could see them and that he had a finger pointed at Koehler. While Shannon and Koehler were at arm's length, Murad and Navrkal were to Koehler's right and Shannon's left.

The defendants claim that Shannon then poked Koehler in the chest with his two fingers, while Shannon denies that he touched Koehler. It is undisputed that shortly after Shannon neared Koehler, Koehler turned off his flashlight and placed both hands behind his back in order to holster his flashlight in the ring holder located in the middle of the backside of his belt. The defendants allege that Shannon then poked Koehler in the chest a second time, and it is undisputed that Koehler took Shannon down by pushing his upper body and sweeping his legs—the parties dispute whether Koehler performed a proper leg sweep. . . . Because of Koehler's actions in taking down Shannon, he fell backward onto a bar stool. . . .

After Shannon was on the ground, Koehler attempted to handcuff him. Koehler told Shannon to put his arms behind his back. Koehler grabbed Shannon by the arm, rolled him and was able to get his left arm behind his back. Koehler was able to get one handcuff on Shannon's left arm. The defendants claim that Shannon tucked his right arm underneath his body and would not put it behind his back despite being ordered by Koehler to do so. The defendants also claim that, while Shannon was being handcuffed, he was belligerent. However, Shannon denies that he tucked his right arm underneath his body, denies not putting it behind his back, and denies that he was belligerent.

Shannon claims that he received the following injuries on September 13, 2006: atelectasis in the base of the left lung (collapsed lung), multiple fractured ribs, a contusion to the head, a five centimeter laceration to the head, bruising on the left leg, left shoulder, left arm, and pelvis/hip, and a laceration to the right shoulder. The defendants claim, however, that the medical records from that night show that Shannon was only treated for a head laceration, which required stitches.

*See Shannon v. Koehler*, 673 F. Supp. 2d 758, 762-64 (N.D. Iowa 2008).

## B. *Procedural Background*

Rather than recite the entire history of this case, I explain the procedural background relevant to the motion currently before me. Shannon has filed suit against Officer Michael Koehler, the City of Sioux City, and Police Chief Joseph Frisbie, alleging excessive force under § 1983 and state claims for assault and battery, as well as municipal liability on each claim.

I have previously entered two orders regarding motions in limine in this case. On January 19, 2011, I filed a sealed Order Regarding Plaintiff's First Motion In Limine And Supplement. (docket no. 91.) In this Order, I granted Plaintiff's First Motion In Limine, to the extent that, the defendants may not refer, directly or indirectly, to Shannon's alleged punch at, or assault on, Navrkal. I also granted Plaintiff's Supplement, to the extent that, the defendants may not refer, directly or indirectly, to: Shannon's prior or subsequent "bad acts"; Shannon physically resisting the Woodbury County jailers on September 13, 2006; evidence contained within Shannon's employment file with the Iowa Department of Public Safety from 1979-1992; third party statements noted in the Sioux City Police reports describing the incident between Shannon and Koehler on September 13, 2006; Shannon's treatment for depression and prescription for Wellbutrin; the term "sugar daddy" to describe Shannon; Koehler responding to an "assault" dispatch; recorded statements by Murad and Navrkal; discussion of bifurcation issues; and dismissal of the Sioux City Police Department as a former party. I denied Plaintiff's Supplement, to the extent that, the defendants may refer, directly or indirectly, to: Shannon's intoxication on September

13, 2006; and the Sioux City Police reports describing the incident between Shannon and Koehler on September 13, 2006.[1]

On September 16, 2011, I filed a sealed Order Regarding Defendants' Motions In Limine; Plaintiff's Second Motion In Limine; And Defendants' Motion In Limine To Exclude Plaintiff's Experts, Joseph Stine And Zhongming Huang, Or, In The Alternative, Challenging Admissibility of Testimony Of Joseph Stine And Zhongming Huang Under Fed. R. Evid. 702. (docket no. 124.) I granted the defendants' Motions In Limine to the extent that Shannon may not refer, directly or indirectly, to the November 3, 2006, excessive force complaint involving Koehler, and may not refer, directly or indirectly, to the July 2, 2005, excessive force complaint involving Koehler, unless Shannon shows some permissible other purpose under Rule 404(b); and neither party may refer, directly or indirectly, to the motor vehicle accident on October 26, 2005; the El Forastero investigation; offers of compromise or to "Golden Rule" arguments; the *Monell* or *respondeat superior* claims against the City of Sioux City and Joseph Frisbie; or otherwise refer, directly or indirectly, to bifurcation issues. I denied the defendants' Motions In Limine to the extent that Shannon may refer, directly or indirectly, to his acquittals for assault of a peace officer and public intoxication, subject to a limiting instruction from the court. I determined, however, the defendants will be permitted to present evidence regarding Shannon's criminal charges from September 13, 2006, and interference with official acts conviction, subject to a limiting instruction from the court. I also denied as

---

[1] I found these police reports and statements within the reports inadmissible insofar as Koehler is offering his own statements as an admission under Federal Rule of Evidence 801(d)(2)(A), and where the defendants are unable to redact the portions referring to Shannon's alleged assault on Navrkal under Federal Rule of Evidence 403.

premature the defendants' motion to exclude any evidence of excessive force complaints after September 13, 2006, against the Sioux City Police Department, as they relate to the unconstitutional custom or practice of the Sioux City Police Department or Joseph C. Frisbie.

I granted Shannon's Second Motion In Limine, to the extent that the defendants may not refer, directly or indirectly, to the fact that Shannon's 2011 felony conviction was his third OWI offense or to Cristina Navrkal's voluntary witness statement or her taped statement. I denied Shannon's Second Motion in Limine, to the extent that the defendants may refer, directly or indirectly, to Shannon's 2011 felony "Operating While Intoxicated" conviction to impeach his credibility under Rule 609(a), subject to a limiting instruction. I granted the defendants' Motion to Exclude Plaintiff's Experts, to the extent that Shannon may not refer, directly or indirectly, to Joseph Stine's opinions about whether Koehler's conduct was excessive, unreasonable, or a "shocking abuse of police powers"; the credibility of witnesses or about what occurred in the surveillance video; or Koehler's state of mind at the time of the incident. I denied the defendants' Motion to Exclude Plaintiff's Experts, to the extent that, I reserved ruling on whether Joseph Stine is qualified and whether his testimony is relevant and reliable; I denied the defendants' motion to exclude or limit Stine's testimony on the *Monell* claim as premature; and I denied the defendants' motion to exclude or limit Zhongming Huang's testimony as premature.

On October 4, 2011, Shannon filed his Third Motion In Limine To Preclude Testimony And Affidavits of Chancy Dean (docket no. 127). On October 11, 2011, the defendants filed their Resistance (docket no. 128). On October 14, 2011, Shannon submitted his reply (docket no. 129). Trial is scheduled to begin November 7, 2011. I now turn to an analysis of the legal issues presented.

7

## II. ANALYSIS

### A. Arguments Of The Parties

Shannon moves to exclude Chancy Dean's testimony and affidavits in their entirety. Dean worked as a bartender at Tom Foolery's on September 13, 2006, but he left approximately a half hour before the encounter between Shannon and Koehler occurred. Shannon anticipates that the defendants will call Dean to testify to the following matters:

> Mr. Dean's background (Dean Depo. 4-6); Mr. Dean's observations of a cut to Shannon's head (the same cut that precipitated Jill Murad's 911 telephone call for an ambulance for Shannon) (Dean Depo. 14, 27); other irrelevant events occurring before Koehler arrived at Tom Foolery's including among other things defense counsel's inquiry into whether Shannon had "wet himself" (Dean Depo. 26: 16-18); Mr. Dean's claims that Shannon told Mr. Dean that he would probably be getting a call about testifying (Dean Depo. 19: 13-17) and later, Mr. Dean's claim to have had conversations with Shannon whereby Shannon insinuated that Shannon "would take care of" Mr. Dean in the event Mr. Dean testified (Dean Depo. 19: 18-25; 20-21); Mr. Dean's having "heard" that Shannon paid some people to beat up Kevin Maloney (Dean Depo. 30: 1-12); and that it was well-known that Mr. Shannon and Jill Murad were "friends with benefits" and "having sex" (Dean Depo. 37: 13-25; 38: 1-4).

Shannon's Third Motion In Limine at 1-2 (docket no. 127). First, Shannon argues that Dean's testimony and affidavits should be excluded in their entirety because the defendants did not timely disclose him as a witness. Second, Shannon asserts that Dean's testimony is barred by my January 19, 2011, Order, in which I excluded evidence of Shannon's bad acts before and after September 13, 2006. Third, Shannon contends that Dean's testimony is irrelevant to the inquiry in this case—whether Koehler's actions were reasonable—and, moreover, that any probative value of Dean's testimony is substantially outweighed by its

8

prejudicial effect. Fourth, Shannon argues that Dean's testimony is improper evidence of Shannon's character for truthfulness under Rule 608(b), which does not permit the use of extrinsic evidence to prove specific instances of conduct relating to a witness's character for truthfulness.

The defendants respond that they do plan to call Dean as a witness, but only to testify to the following matters:

> a. His background;
> b. Mr. Dean's observations of a cut to the Plaintiff's head and howit [*sic*] occurred;
> c. Mr. Dean's claims that Shannon told Mr. Dean he would be getting a call about testifying;
> d. Mr. Dean's testimony that Plaintiff offered him money with the insinuation that Mr. Shannon [*sic*, Dean] would testify falsely for and favorably to the Plaintiff; and
> e. Mr. Dean's activities prior to departing Tom Foolery's, subject, of course, to this Court's prior restrictions in its Order dated January 19, 2011.[2]

Defendants' Resistance at 2-3 (docket no. 128-1). First, the defendants argue that Federal Rule of Civil Procedure 37 does not bar Dean's testimony, no matter if the defendants did not timely disclose him, as Shannon has long known of Dean's existence because Dean was Shannon's own employee. Second, the defendants assert that the topics of Dean's testimony are not barred by my January 19, 2011, Order. Third, the defendants argue that Shannon's counsel already agreed, in prior correspondence with the defendants, that Dean's testimony regarding the cut to Shannon's head would be relevant and admissible.

---

[2] The defendants state that they "do not intend to offer testimony regarding Mr. Shannon's relationship with Jill Murad, . . . whether Plaintiff had 'wet himself' prior to the incident. . . . or evidence from Mr. Dean regarding what he 'heard' about Mr. Shannon paying persons to injure Kevin Maloney." Defendants' Resistance at 2 (docket no. 128-1). Therefore, Shannon's motion is granted by agreement as to these topics.

9

Fourth, the defendants argue that Shannon incorrectly analyzes Dean's testimony regarding Shannon's "witness tampering" as impeachment of Shannon's character for truthfulness under Rule 608(b). Rather, the defendants assert that Shannon's alleged attempts to "tamper" with Dean are admissible as substantive evidence against Shannon. Citing *Great American Insurance Co. v. Horab*, 309 F.2d 262 (8th Cir. 1962), the defendants argue that Shannon's witness tampering is admissible against him as an admission of his "consciousness that his case is weak or unfounded." Defendants' Resistance at 5 (docket no. 128-1). Finally, the defendants argue that the probative value of Dean's testimony is not outweighed by its prejudicial effect or potential for confusion.

### B. Analysis

#### 1. Discovery violation

I first address whether Dean's testimony should be excluded completely as a sanction for the defendants' failure to disclose him timely as a witness. The Eighth Circuit Court of Appeals has explained that, under Federal Rule of Civil Procedure 37, when a party has failed to make a timely disclosure of a witness or other evidence, "[t]he district court may exclude the information or testimony as a self-executing sanction unless the party's failure to comply is substantially justified or harmless." *Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008); *accord Davis v. U.S. Bancorp*, 383 F.3d 761, 765 (8th Cir. 2004) (affirming district court's determination that failure to disclose was harmless where there was "no unfair surprise"). Here, even if the defendants' disclosure of Dean was untimely, the failure was harmless. Dean was Shannon's own employee and was working at Tom Foolery's on September 13, 2006, so Shannon clearly knew of his existence. Shannon's counsel knew of Dean at least by the point of Shannon's deposition on December 18, 2008, when Shannon explained that "Chancey" was working as a bartender at Tom Foolery's on September 13, 2006. *See* Defendants' Appendix at 16, Shannon's

10

Deposition at 127:22-128:22 (docket no. 128-2). Consequently, there is no "unfair surprise" in the defendants' use of Dean as a witness, making any failure to disclose him harmless.

### 2. *Admissible portions of Chancy Dean's testimony*

I now turn to the content of Dean's testimony. As with any witness, Dean may testify to his background. He may also testify about his observations of the cut to Shannon's head and how Shannon received that cut before Koehler arrived. Shannon claims that, as a result of Koehler's use of force, he sustained, among other injuries, "a contusion to the head [and] a five centimeter laceration to the head." *See Shannon v. Koehler*, 673 F. Supp. 2d 758, 764 (N.D. Iowa 2008). Thus, evidence of a cut to Shannon's head on September 13, 2006, before Koehler ever arrived is directly relevant to the extent of Shannon's injuries and damages in this case.[3]

### 3. *Inadmissible portions of Chancy Dean's testimony*

Dean may not testify about whether "Shannon told Mr. Dean he would be getting a call about testifying; [or whether Shannon] offered him money with the insinuation that [Dean] would testify falsely for and favorably to the Plaintiff." The defendants cite only one Eighth Circuit Court of Appeals case in support of their position that Shannon's alleged "tampering" with Dean is admissible to show Shannon's "consciousness that his case is weak or unfounded." *See Great Am. Ins. Co. v. Horab*, 309 F.2d 262, 264 (8th

---

[3] The defendants add that Dean will also testify to "Mr. Dean's activities prior to departing Tom Foolery's, subject, of course, to this Court's prior restrictions in its Order dated January 19, 2011." Defendants' Resistance at 2-3 (docket no. 128-1). This description does not provide me with sufficient information to determine whether Dean's testimony regarding his "activities prior to departing Tom Foolery's" is relevant and admissible in this case. Therefore, I cannot rule definitively on this portion of Dean's testimony at this time.

11

Cir. 1962). What the defendants fail to mention, however, is that the Eighth Circuit Court of Appeals, in *Great American Insurance Co.*, actually affirmed the district court's decision to *exclude* evidence of a party's alleged witness tampering, finding that "its admission or exclusion fell within the area of judicial discretion." *Id.* at 265 (affirming exclusion of evidence that the party's son interfered with the service of a subpoena on a witness, where the party's son eventually "did back away, the service upon [the witness] was effected, and the witness did appear in response to the subpoena.").

Likewise, it is within my discretion to exclude Dean's testimony on Shannon's alleged tampering. I find here that the probative value of Dean's testimony on this topic is "substantially outweighed by the danger of unfair prejudice" to Shannon. *See* FED. R. EVID. 403; *United States v. Myers*, 503 F.3d 676, 682 (8th Cir. 2007) ("Under Rule 403, district courts have broad discretion to assess unfair prejudice, and are reversed only for an abuse of discretion."). To begin, the probative value of Dean's testimony regarding Shannon's "tampering" is ambiguous at best. The defendants characterize Shannon's tampering, as follows:

> Plaintiff does not want the jury to know that he, on several occasions, offered to pay Chancy Dean $5,000.00 to testify on his behalf. Mr. Dean believed Plaintiff wanted him to testify falsely, so he told Plaintiff he would not lie for him. Plaintiff offered to pay Dean for testimony favorable to him. Plaintiff even suggested payment would be based upon "whatever he would get off of it." Def. App. at 5 (Dean Dep. at 19:13-21:17); Def. App. at 7-8 (Dean Dep. at 41:4-43:1). Mr. Dean said Plaintiff insinuated that he wanted Mr. Dean to lie. Dean Dep. at 45:14-24.

Defendants' Resistance at 3-4 (docket no. 128-1). The defendants' representation of Shannon's alleged tampering, however, is quite different from what Dean actually said:

12

Q: Did Mr. Shannon ever ask you to testify that you had seen the incident?
A: I don't think he asked me to testify, but I think he said I would probably be getting a call.
Q: At any point did he tell you how he would like you to testify or offer you anything to testify in his favor?
A: There was a couple incidents where he had been drinking and he had said that he would take care of me if I testified for him.
Q: What did you understand that to mean?
A: Well, he had thrown out a couple dollar amounts.
Q: What dollar amounts, if you remember?
A: 5,000. He said it would depend on how much money he got off of it.
Q: Did -- did he ever ask you to -- more specifically, I guess, did he ask you to testify that you had seen him being assaulted by an officer?
A: No
Q: It was more, just more general as you've described?
A: Uh-huh. Yes.
Q: When would these conversations have taken place?
A: They were usually after closing time when he had been drinking.
Q: How long after September 13?
A: I can't put a date on it. There was two or three times, but it's nothing that I really ever took serious, I guess.
Q: How long ago do you think it was that he last -- you said he made -- two or three times he had done this. When do you think it was the last time that he would have done such a thing?
A: I honestly don't know. I haven't seen him probably since I left there --
Q: Oh, okay.
A: -- five years ago.
Q: Would it be fair to say then that it was -- these conversations would have happened while you were still working there?
A: Yes.

13

> Q: You made the comment that you didn't necessarily take these offers too seriously. I take it did you ever tell him basically I refuse to accept?
> A: I told him I wouldn't lie for him.
> . . . .
> Q: . . . . Did you say, no, thanks, Tim, or Tim, you're drunk, let's talk about it when you're sober?
> A: Yeah.
> Q: Which?
> A: Both really. I mean I told him I wouldn't lie for him and I also said you're drunk.
> Q: And you said this happened on more than one occasion?
> A: Yes.
> . . . .
> A: He just said he would take care of me if I testified. He never said lie or anything, but he -- there was insinuations.
> Q: That you would be taken care of?
> A: Yes.

Defendants' Appendix at 1, Chancy Dean's Deposition at 19:13-21:17; 44:13-46:1 (docket no. 128-1). Dean himself stated that he did not take Shannon seriously because Shannon was drunk on the "two or three times" he offered Dean money to testify. Moreover, these "two or three times" occurred while Dean was still working at Tom Foolery's,[4] five years before the defendants identified Dean as a potential witness in August 2011 in their supplemental disclosures. *See* Shannon's Appendix at 20, Defendants' Second Amended Rule 26 Disclosures (docket no. 127-2). Therefore, to call Shannon's overtures "witness

---

[4] Shannon has contacted Dean by text message three times since that time, but the text messages show no evidence of witness tampering. On June 27, 2011, Shannon texted Dean, "Hey guy give me a call when U can." He sent the exact same message the next day. Shannon also sent the message, "Tim" on July 9, 2011, when Dean sent a text message in response, asking who had sent the first two messages. Dean did not call Shannon back. Defendants' Appendix at 1, Chancy Dean's Deposition at 22:18-25:8, Deposition Exhibits 3-5 (docket no. 128-2).

tampering" stretches the bounds of credulity, as Dean was not even identified as a witness when these conversations occurred. Therefore, the probative value of Dean's testimony regarding Shannon's alleged tampering is very low.

Furthermore, this low probative value is substantially outweighed by the danger of unfair prejudice to Shannon. Unfairly prejudicial evidence been described as evidence that is "'so inflammatory on [its] face as to divert the jury's attention from the material issues in the trial.'" *United States v. Adams*, 401 F.3d 886, 900 (8th Cir. 2005) (quoting *United States v. Shoffner*, 71 F.3d 1429, 1433 (8th Cir. 1995)); *see also* FED. R. EVID. 403, Advisory Committee Notes ("'Unfair prejudice' . . . means an undue tendency to suggest decision on an improper basis . . . ."). Dean's testimony that Shannon offered to pay him to testify is "so inflammatory on [its] face as to divert the jury's attention from the material issues in the trial," because it creates the appearance that Shannon has used improper and deceitful means in securing evidence for trial, when, in fact, Dean did not even take Shannon's alleged offers seriously. Therefore, the probative value of Dean's testimony regarding Shannon's alleged witness tampering is substantially outweighed by its prejudicial effect, and Dean may not testify to whether "Shannon told Mr. Dean he would be getting a call about testifying; [or whether Shannon] offered him money with the insinuation that [Dean] would testify falsely for and favorably to the Plaintiff."[5] Similarly, Dean's affidavits regarding Shannon's alleged tampering are inadmissible.

---

[5] Moreover, the defendants may not use Dean's testimony to impeach Shannon's character for truthfulness, as Rule 608(b) does not permit the use of extrinsic evidence to prove specific conduct relating to a witness's character for truthfulness. FED. R. EVID. 608(b); *United States v. Lightfoot*, 483 F.3d 876, 881 n.5 (8th Cir. 2007) ("Rule 608(b) 'forbids the use of extrinsic evidence to prove that the specific bad acts occurred.'" (quoting *United States v. Martz*, 964 F.2d 787, 789 (8th Cir. 1992))).

### *4.     Questioning Shannon regarding Chancy Dean*

On a related note, it appears that the defendants plan to question Shannon on cross-examination as to whether he offered Dean money to testify on his behalf: "Plaintiff will likely be given the opportunity to admit or deny the testimony of Mr. Dean." Defendants' Resistance at 6 (docket no. 128-1). "Under Rule 608(b), a district court, at its discretion, may permit impeachment of a witness by cross-examination regarding specific instances of conduct not resulting in conviction, if the conduct is probative of the witness's character for truthfulness or untruthfulness." *United States v. Reaves*, 649 F.3d 862, 866 (8th Cir. 2011); *see* FED. R. EVID. 608(b). Here, I exercise my discretion and prohibit the defendants from questioning Shannon regarding his alleged tampering with Dean. As I have already determined, Shannon's alleged tampering is highly prejudicial. Moreover, it is not very probative of Shannon's character for truthfulness, as he was intoxicated when he made the alleged statements. Therefore, the defendants may not question Shannon about his alleged tampering with Dean's testimony.

## III.  CONCLUSION

THEREFORE, I

1. **Grant** Shannon's Third Motion In Limine (docket no. 127), to the extent that,

   a) the defendants may not refer, directly or indirectly, to Shannon's alleged witness tampering with Chancy Dean. Therefore, Dean may not testify as to Shannon's alleged witness tampering, including whether Shannon told Dean he would be getting a call about testifying and whether Shannon offered him money; Dean's affidavits are inadmissible; and the defendants may not question Shannon regarding the alleged tampering.

b) Dean may not testify about Shannon's relationship with Jill Murad, whether Shannon "wet himself," or whether Shannon paid someone to injure Kevin Maloney.

2. **Deny** Shannon's Third Motion In Limine (docket no. 127), to the extent that,

a) Dean may testify to his background and his observations of the cut to Shannon's head and how Shannon received that cut before Koehler arrived.

b) I do not have sufficient information at this time to rule on the admissibility of Dean's testimony regarding his "activities prior to departing Tom Foolery's."

**IT IS SO ORDERED.**

**DATED** this 19th day of October, 2011.

_____
MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA